DEANE S. REYNOLDS *vs.* PARK TRUST COMPANY & another.

Suffolk. March 19, 1923. — May 26, 1923.

Present: RUGG, C.J., DECOURCY, CROSBY, PIERCE, & CARROLL, JJ.

*Bills and Notes*, Purchaser for value, Holder in due course. *Fraud.*

In a suit in equity by the owner of certain land against a trust company to have cancelled a mortgage made by a " straw man," in whose name the plaintiff previously had taken title to land in Auburndale, to a contracting builder, and also to have cancelled an assignment of the mortgage to the defendant and to enjoin foreclosure of the mortgage by the defendant, findings by a master established the following facts: The plaintiff, when he had only an option for the purchase of the land, then vacant, made with the builder a contract in writing, in which he was described as the " owner," whereby he agreed to deposit $2,150 with an architect and, upon the completion by the builder of a house on the land, to sign two mortgages aggregating $9,600 to be placed by the builder, who was to have the proceeds and the original deposit for erecting the building according to agreed specifications. Shortly thereafter, the builder took the contract to the president of the defendant, to which he already was heavily indebted, and left it with him, saying that later he would want to borrow some money on it. Over a month later, the builder told the plaintiff that he had given the contract to the bank and, by agreement between the plaintiff and the builder, the deposit in the hands of the architect was used to purchase the land in the name of the straw man, who executed a mortgage of $10,000 to the builder to be used by the builder to raise funds for building, and thereafter conveyed the land to the plaintiff subject to the mortgage. The builder forthwith indorsed the mortgage note in blank and executed an assignment of the mortgage to the defendant, and gave the note and the assignment, along with a similar assignment of a mortgage on other property in the same locality, to the vice-president of the defendant, whom he had not seen before and who had been pressing him for a reduction of a preëxisting debt owed by him to the defendant. The vice-president knew nothing of the original building contract, previously left with the president. On the same day after banking hours and in the absence of the vice-president the president gave the builder an additional loan of $8,500, taking a collateral note on " the following securities: Auburndale contracts." The builder thereafter performed on the plaintiff's land only foundation work costing around $500. The master found that the trust company had no actual notice of fraud on the part of the builder. *Held*, that

(1) At common law and by statute the taking by the defendant of the negotiable note of the straw man, indorsed by the payee before maturity, as security for a preëxisting debt of the payee was a taking for value and could not be set aside in the absence of knowledge of fraud or participation in it by the defendant;

(2) Although the conduct of the builder amounted to a fraud on the plaintiff, on the facts found no notice was to be imputed to the defendant nor was the defendant to be charged with constructive knowledge of such fraud;

(3) While investigation would have shown fraud, the defendant in the circumstances was not bound to make such investigation.

BILL IN EQUITY, filed in the Superior Court on November 23, 1921, and afterwards amended, seeking the cancellation of a mortgage by one Fee, holder as a " straw man " of real estate purchased by the plaintiff, to one Brown and of an assignment of that mortgage to the defendant, and an injunction against its foreclosure.

In the Superior Court, the suit was referred to a master. Material findings by the master are described in the opinion. The suit was heard upon the pleadings and the master's report by *Morton*, J., by whose order there were entered an interlocutory decree confirming the report and a final decree dismissing the bill with costs. The plaintiff appealed.

*R. P. Dellinger*, for the plaintiff.

*J. Clark, Jr.*, for the defendant.

CARROLL, J.  The plaintiff in November, 1920, secured an option on a tract of land in that part of Newton known as Auburndale, on which he desired to have a building constructed. He made a contract in writing with Harry B. Brown, a builder, which provided that Brown was to build a house on the land, that Brown was to secure two mortgages aggregating $9,600, and that on the completion of the house the plaintiff was to assume the mortgages and pay Brown $2,150. The mortgages were to be executed to parties designated by Brown. Although the plaintiff had merely an option on the real estate, the contract stated that he was the owner; it recited that, if Brown failed to construct the house in accordance with the plans, the architect was to return the $2,150 deposited with him by the plaintiff, and if the plaintiff failed to carry out the contract, the architect was to pay Brown this sum of $2,150 as liquidated damages.

Shortly after November 10, 1920, Brown deposited a copy of the contract with Ralph Mann, who was at that time president of the defendant Park Trust Company, stating

to him that later he would want to borrow some money on it. Mann did not examine the contract in detail and during the following six weeks the contract was not again called to the attention of the bank. On December 15, 1920, the plaintiff was informed by Brown that he had given the contract to the bank; that it was necessary to mortgage the property to the bank in order to secure a construction loan; and that the plaintiff, by using the $2,150 held by the architect, could purchase the land and mortgage it for $10,000. The plaintiff assented to this and in order to save himself from personal liability, agreed to take title in the name of a straw man, with the understanding that the mortgages to be given were to be used by Brown for the sole purpose of securing funds to carry out the building contract. The property was then purchased in the name of Thomas Fee, a straw man furnished by Brown. Fee gave Brown a mortgage for $10,000 with a note for the same amount, payable to Brown, or order, with the notation thereon: " Secured by mortgage of real estate in Woodland Road, Auburndale, to be recorded Mx. So. Dis. Registry of Deeds." Fee then conveyed the property to the plaintiff, subject to the mortgage to Brown.

On December 18, 1920, Brown took the Fee note indorsed in blank and the assignment of the mortgage to the Park Trust Company. He there for the first time saw the vice-president, who had been demanding of Brown additional security on certain Dwight and Androscoggin contracts on which the defendant trust company had lent money to Brown. Brown delivered to the vice-president the Fee note and assignment, and also a mortgage on other property in Auburndale known as the Cook property. The note, assignment and mortgage were given as additional collateral for the Dwight and Androscoggin contracts and were so applied. The vice-president did not know at this time that the original contract with the plaintiff was in possession of the trust company, and there was no reference to this contract on the face of the note and assignment. The master found that, had the vice-president made such an investigation as would have been made if the trust company were

loaning new money on the note and assignment, the connection between the original contract and the note and contract would have been discovered. Brown had no authority of any kind from Reynolds to use the Fee note and mortgage, except to raise money to be used under the Reynolds-Brown contract. It was further found that when the assignment was given the trust company, it had no notice of Brown's plan to have the plaintiff purchase the property in the name of Fee, or of Brown's scheme to use the assignment for his own purposes; and it did not at that time know that the assignment of the mortgage of $10,000 related to a vacant lot of land of the value of not more than $2,300. After banking hours, on December 18, 1920, and after the vice-president had left the bank, Brown secured from Mann a loan of $8,500, which was, on December 20, credited to his account. Brown gave a note for this amount, in collateral form, and it recited in part that there was deposited in the trust company for payment of this and other liabilities, " the following securities; Auburndale contracts." But neither of the Auburndale contracts was in any way assigned to the trust company, and the company had no collateral pledged for the $8,500 note: as the report shows, this $8,500 was lent to Brown for construction purposes on the Auburndale contracts, but without security and without any reliance on the value of the Fee note and mortgage. On December 20, Brown had overdrawn his account with the trust company and his balance on that day after the note was placed to his credit was less than $2,500; and on December 23, his account was again overdrawn. The loans of Brown from the trust company on the Dwight and Androscoggin contracts are in excess of the value of the land in question. Foundation work was done by Brown after December 18, on the Reynolds contract, to the value of about $500 or $600, but no other labor was performed or furnished.

When the Reynolds contract was signed, Brown had planned to have Reynolds purchase the property in the name of Fee, to have Fee give him (Brown) the mortgage and note, and to use the note and mortgage as collateral for the loan

to the trust company on the Dwight and Androscoggin contracts. Shortly after December 20 the note teller directed the vice-president's attention to the $8,500 note of Brown, and the vice-president then saw the Reynolds contract. It was found by the master that the vice-president when the note and assignment were received and applied to the existing indebtedness, did not know that they related to the Reynolds contract; and it was not until February, 1921, that he knew that the Fee mortgage was upon property to which Reynolds had a claim. It was found that if Mann had seen the Fee note and assignment, he would have reason to believe that they related to the Reynolds contract; but the vice-president had no actual knowledge from any source which would have led him to doubt the statement of Brown that the mortgages were first mortgages of properties in fine localities in Auburndale. In February, 1921, or at some time subsequent, the trust company first discovered that the Reynolds contract had been changed; and sometime between December 20, 1920, and March, 1921, learned that the Fee mortgage was on a vacant lot of land. The plaintiff did not know of the assignment of the mortgage until after it was recorded on March 10, 1921. The Fee mortgage was recorded December 18, 1920, at 10:13 A.M. and the trust company did not receive it until March, 1921.

A fraud was committed by Brown on Reynolds; but if the Park Trust Company was a holder for value, and received the note with the assignment of the mortgage without knowledge of the infirmity or defect, or knowledge of such facts that its action amounted to bad faith, it can hold the security; and the plaintiff cannot have relief against it. Brown was indebted to the trust company. It was, therefore, a purchaser for value when the note was transferred to it as security for a preëxisting debt. At common law, in this Commonwealth, the taking of a negotiable promissory note before maturity as security for a preëxisting debt, is a taking for value. *Goodwin* v. *Massachusetts Loan & Trust Co.* 152 Mass. 189, 199. See also *Boston Steel & Iron Co.* v. *Steuer,* 183 Mass. 140, 143. Under the negotiable instruments statute G. L. c. 107, § 48, " An antecedent or

preëxisting debt constitutes value, and is deemed such whether the instrument is payable on demand or at a future time." The sales act, G. L. c. 106, § 65, cl. 1, defines value as " any consideration sufficient to support a simple contract. An antecedent or preëxisting claim, whether for money or not, constitutes value where goods or documents of title are taken either in satisfaction thereof or as security therefor." On the facts found by the master, as the Park Trust Company received the note and an assignment of the mortgage as additional collateral to the loans then existing, it was a holder for value.

The master found that the trust company had no notice of the fraud of Brown, and that when the note and assignment were received both were in due form; his findings on this question are conclusive unless it appears from the report that they are clearly wrong. A copy of the Brown-Reynolds contract was left with the president of the trust company within a short time after its execution; but no money was then lent on it, and nothing was said concerning its application as security for Brown's indebtedness. It was deposited with Mann, because Brown at some time in the future contemplated asking for a loan on the strength of the contract; and during the six weeks following, the attention of the trust company was not directed to it. At no time was this contract assigned to the company. The contract shows on its face that Reynolds was the owner of the real estate, but as matter of fact he was not the owner; he was merely the holder of an option to purchase, and it was not until after December 18, 1920, that the trust company learned that he was not the owner. It is expressly found that the vice-president had no knowledge that the Reynolds-Brown contract was held by the trust company at the time it received the Fee note and assignment, together with the mortgage on the Cook property, as additional collateral for the existing loans. The trust company had no knowledge, when the note and assignment were delivered to it, of any plans of Brown to have Reynolds purchase land in the name of Fee and to use the note and assignment for his own purposes. These are findings of fact and show that there was no notice,

by the trust company of any infirmity in the note and assignment.

On the facts found, no notice is to be imputed to the trust company. There was no conversation with Mann when the note and assignment were delivered; he did not examine the Reynolds contract when it was left with him; no request was made at that time for a loan, and when Brown subsequently requested a loan the note and assignment had already been placed with the trust company as additional security for the Dwight and Androscoggin contracts.

In view of the master's findings that the Park Trust Company had no notice of Brown's plan to have Reynolds purchase the land in the name of Fee, or of Brown's plans to use the note and assignment for his own purposes; that the vice-president had no knowledge when the note and assignment were received that they related to the Reynolds contract; that the contract had been changed; or that the mortgage to Fee was on the property to which Reynolds had a claim; the trust company is not to be charged with constructive knowledge of the fraud of Brown and notice is not to be imputed to it of any defect in the title of the assignment or infirmity in the note.

There was no finding of fraud on the part of the trust company; neither was it found that it had knowledge of such facts as would show that in taking the note and assignment it acted in bad faith. An investigation by the officers of the trust company would have shown that Brown had defrauded Reynolds, but they were not bound to make such investigation. Reasonable cause to know of a defect in the instrument is not the equivalent of knowledge. *Fillebrown* v. *Hayward,* 190 Mass. 472. *Pierce* v. *O'Brien,* 189 Mass. 58, 60, and cases cited.

As the trust company became the owner of the note and assignment for a valuable consideration, the transfer cannot be set aside in the absence of knowledge of fraud or participation in it. *Pierce* v. *O'Brien, supra. Gately* v. *Kappler,* 209 Mass. 426, 431. *Cohen* v. *Levy,* 221 Mass. 336, 339. The fact that the original contract was in the possession of the trust company and that the mortgage was not delivered

with the note and assignment, under all the circumstances disclosed, including the fact that the original contract had been changed and the mortgage was then in the registry of deeds, did not require a finding that the trust company had notice of the fraud.

*Strong* v. *Jackson*, 123 Mass. 60, and *Murphy* v. *Barnard,* 162 Mass. 72, are to be distinguished. The record title of the mortgage purchased by Miss Barnard in *Murphy* v. *Barnard,* was not in the name of the vendor, but in the name of Mrs. Patch, to whom it had been previously sold; and the unrecorded assignment from Mrs. Patch to the vendor's clerk was held to be not merely voidable, but utterly void. In the case at bar, the real estate on which Reynolds had the option was purchased in the name of Fee, the mortgagor, and the mortgage to Brown recited that the premises were the same "conveyed to me . . . by deed of even date to be recorded herewith." The deed to the plaintiff was made subject to this mortgage. The transaction was not void, as in *Murphy* v. *Barnard.* In *Strong* v. *Jackson*, 123 Mass. 60, Jackson held an assignment of a note and real estate mortgage, given by one McQuaid to the plaintiff, as collateral security for a debt due him from Kingsley. Jackson assigned the mortgage, indorsing the Kingsley note, and passed these instruments to the Tremont National Bank. Later he indorsed the McQuaid note in blank and delivered it to the First National Bank; and also assigned to that bank the McQuaid mortgage; no reference being made in this assignment to the Kingsley note. It was held that if the First National Bank had examined the record, it would have been apparent that Jackson was committing a fraud; that the assignment to him would have shown that he held the note for a purpose inconsistent with the sale of it, and the further fact that he had already disposed of the title which he originally acquired.

*Merchants National Bank* v. *Marden, Orth & Hastings Co.* 234 Mass. 161, and the cases relied on by the plaintiff, do not conflict with what is here decided.

The decree of the Superior Court dismissing the plaintiff's bill was right; and it is affirmed.

*So ordered.*