Elbar Realty, Inc. *vs.* City Bank & Trust Company.

Suffolk.    December 6, 7, 1960. — March 15, 1961.

Present: Wilkins, C.J., Spalding, Williams, & Cutter, JJ.

*Conversion. Bills and Notes,* Holder in due course, Certificate of indebtedness. *Conflict of Laws. Good Faith. Evidence,* Presumptions and burden of proof, Relevancy and materiality, Of good faith. *Practice, Civil,* Ordering verdict.

An action for conversion of a United States Treasury bearer certificate of indebtedness which in Massachusetts was stolen from its owner, the plaintiff, and subsequently pledged to and collected by a bank, the defendant, was governed by Massachusetts law, not Federal law. [266–267]

The provisions of G. L. c. 107, § 82, were applicable in an action, not upon a bearer certificate of indebtedness, but for conversion thereof. [267–268]

In an action against a bank for conversion of a bearer certificate of indebtedness pledged to and collected by the defendant, proof that the certificate had been stolen from its owner, the plaintiff, before it was so pledged cast upon the defendant under G. L. c. 107, § 82, not merely the burden of going forward with evidence that it took the certificate as a holder in due course but the ultimate burden of proof of that fact. [268]

In an action against a bank for conversion of a bearer certificate of indebtedness stolen from its owner, the plaintiff, and pledged to the bank to secure a loan and subsequently collected at maturity by the bank, evidence of the circumstances in which the bank made the loan to and took the certificate as collateral from one in possession thereof, who was unknown to the officers of the bank, although introduced by a director, and who said that the certificate was the property of a "client" of his, and the proceeds of the loan were placed in an account in the bank in the name of the borrower from which he shortly withdrew large sums in cash, did not require as matter of law findings that the bank took the certificate in good faith and was a holder in due course thereof, nor entitle the bank to a directed verdict. [269–273]

On the issue of the good faith of a bank in taking as collateral security for a loan a bearer certificate of indebtedness which had been stolen from its owner, evidence of facts unknown to the bank at the time of so extending credit was irrelevant even if such facts might have been discovered by the bank had it made the inquiry· called for by the knowledge which it then did have. [273–275]

Tort.    Writ in the Superior Court dated May 14, 1958. The action was tried before *Morton,* J.

Elbar Realty, Inc. *v.* City Bank & Trust Co.

*Joseph P. Rooney*, (*Franklin T. Hammond, Jr. & Ansel B. Chaplin*, with him,) for the defendant.

*Charles C. Worth*, for the plaintiff.

CUTTER, J.   The plaintiff (Elbar) seeks to recover from the defendant (City Bank) for the alleged conversion of a United States Treasury certificate of indebtedness.[1]   The jury found for Elbar in the sum of $101,633.33.   City Bank presents its exceptions, among others, to the refusal to direct a verdict for it, to the refusal of a mistrial, and to rulings on evidence.   The evidence is stated in its aspect most favorable to Elbar.

On March 20, 1957, Elbar bought a $100,000 United States Treasury bearer certificate of indebtedness due February 14, 1958.   On August 17 or 18, 1957, the certificate was stolen from Elbar.

During November, 1957, a man who gave a name "something like Fred or Frederico" Serano approached one Shapiro, a "genealogist" (and also a disbarred lawyer, although it was not shown that this was known by City Bank prior to February 20, 1958).   Serano "was a foreign looking person" whom Shapiro "had never seen before."   Serano showed Shapiro the certificate, but did not give Shapiro "an address or telephone number."   Shapiro called by telephone one Goldman, whom he had known for fifty years as a fellow member of a social club, "and asked him if he knew anyone who would buy or loan on a $100,000 certificate . . . at a discount."   Shapiro said that he "wanted to borrow $90,000 for a client."   After trying his own bank, Goldman called one Marks, a social friend for some years who had become "a director in City Bank in December, 1956, just about the time the bank opened."

Marks, after two telephone talks with Epstein, president of City Bank, called back to say that "City Bank would be

---

[1] The case was tried with three similar actions.   Two of these alleged conversion of the same certificate and were brought against The First National Bank of Boston and Nathaniel Shapiro (see *Elbar Realty, Inc.* v. *Shapiro, post*, p. 276), respectively.   A verdict was directed for The First National Bank of Boston and that case is closed.   In the third case a certificate for $10,000 was involved.   A verdict was directed for one of the defendants in that case.

interested" and arranged an appointment for Goldman and
Shapiro with Epstein. Goldman took Shapiro to the bank
and introduced him to Marks. Marks introduced them to
Epstein, who had met Goldman before. Epstein "asked
about the bond and . . . [Shapiro] told him it belonged to
a client . . . out of the country, who wanted to obtain
$60,000 cash on the bond, and . . . thought this would be
the easiest way to negotiate rather than through other
channels." They "discussed the possibility that the . . .
client would leave some money in the bank and the rate of
interest" which was fixed at six per cent, although the
certificate carried interest of only three and three eighths
per cent. Epstein made no inquiry "about Shapiro's busi-
ness, financial status, or where he got the bond, nor was
. . . [he] told that Marks [had] inquired."

Epstein then introduced Shapiro to Swift, executive vice-
president of City Bank, who handled the details of the loan.
"[U]p to this time no one asked where the certificate was,
but Swift [then] did [ask] and . . . [Shapiro] told Swift
he would get the bond." Shapiro then returned to his own
office and "waited until Serano called him." Serano gave
Shapiro the certificate and Shapiro took it to City Bank
and gave it to Swift. Swift looked at the certificate and
asked some questions.

Shapiro then signed a note for $90,000 due on February
14, 1958. He also signed a signature card and an authori-
zation to City Bank to collect the certificate of indebtedness
at its maturity, to use the proceeds to pay his note, and to
deposit "the overage to . . . [his] account." At Epstein's
request Shapiro agreed to open a checking account with
City Bank and informed Swift that "he wanted the account
opened as 'Special' as it was a client's money." Swift
introduced Shapiro to one "Foley, a teller . . . and told
Foley it would be all right to cash a check." Shapiro
"made out a check for $60,000 to cash, presented it to Foley
and said [that] he wanted the money in $100 bills and Swift
heard this." Foley replied that "they did not have that
many on hand and Swift suggested that . . . [Shapiro]

take half in $100 . . . bills then and half the next day.''
Shapiro ''tore up the first check, [and] made out another
for $30,000.'' Foley gathered up ''$100 . . . bills from
other tellers and . . . gave . . . [Shapiro] the money in
300 one hundred dollar bills which . . . [Shapiro] put into
a brief case and took back to his office.'' Shapiro gave this
money to Serano and told him he would have to wait until
the next day for the other $30,000.

On November 27, Shapiro returned to City Bank, made
out a check for $30,000, and asked for the money in $100
bills. Foley gave the money to him, after he had checked
the signature on the check with the signature card and
''called the bookkeeping department and got the 'Okay.' ''
Before giving ''Shapiro the money . . . [Foley] asked
Shapiro if he would take a treasurer's check but Shapiro
said, 'No, I want cash.' '' Foley then ''asked Shapiro why
he would take a chance in carrying that amount of money
around and Shapiro replied that he was a diamond mer-
chant and would get better prices for cash.'' Before Foley
''asked this question of Shapiro he had looked at the signa-
ture card and it was printed right on the card that Shapiro
was a genealogist.'' On December 2, 1957, Foley cashed a
check for Shapiro for $8,000 and on December 6, 1957, one
for $3,000.

When Shapiro told him about the loan, Goldman on
either November 26 or 27 ''asked Shapiro for a loan of
$1,500 . . . [although] Shapiro had never made a loan of
$1,500 to . . . [him] before.'' By appointment Shapiro
met Goldman on November 27 and gave him ''a check for
$1,500.'' It was ''just a friendly loan with no interest,''
not repaid until December, 1958. Goldman was first sum-
moned ''to hearings involving this transaction in October,
1958, and . . . again in December, 1958.''

City Bank was not a member of the Federal Reserve Sys-
tem. It handled transactions with the Federal Reserve
through The First National Bank of Boston (First Na-
tional). Accordingly, on February 14, 1958, City Bank
sent to First National for collection the certificate of in-

debtedness and one coupon. Shapiro's note was stamped "paid" and sent to Shapiro on February 14, and "Shapiro's account in City Bank . . . [was] credited with the difference between the proceeds of the certificate and coupon ($101,678.33) and $90,000 the amount of the note." On February 14, the balance in Shapiro's account was $12,478.33.

First National sent the certificate on February 14 to the Federal Reserve with a request for redemption. On February 20, First National, Epstein, and Swift learned that the bond had been stolen. Various conferences then took place among Epstein, representatives of Elbar, and others. Marks, when asked by the police, failed to recall who was with him, Epstein, and Shapiro in Epstein's office when the loan was made. It later "came to him" who the man (his friend of thirty years, Goldman) was. He notified Epstein but he did not notify the police.

There was also evidence that City Bank "never had a U. S. certificate of indebtedness for $100,000 before this time," or a loan on one; that the loan "was greater than the average loan"; that in respect of such a loan on a "bearer bond they check through their directors to make sure the borrower is the owner; that if a borrower is a friend of a director and the director comes in and says so-and-so is the owner of the bond and the director knew him, City Bank would take that as identification for the bond"; that Epstein, if "told that the bond belonged to a South American client," would not "have accepted it as collateral unless the man who owned it was there"; that at least one officer of City Bank knew that "one can turn in . . . [government] securities to . . . [certain Boston] firms and have his money that day or the next"; and that it "was not usual for a depositor to . . . cash a check . . . of $30,000 and ask for . . . $100 bills . . . [and] to come back the next day with another check for $30,000 and ask for that in $100 bills."

1. City Bank contends that, because the case deals with a negotiable instrument issued by the United States, this

court must apply Federal law with respect to the standards and burden of proof. The Supreme Court of the United States has held otherwise with respect to a Home Owners' Loan Corporation bond, where only private parties were litigants, and the situation involved "the transfer of Government paper between private persons." *Bank of America Natl. Trust & Sav. Assn.* v. *Parnell,* 352 U. S. 29, 33–34. See *Gramatan Natl. Bank & Trust Co.* v. *Moody,* 326 Mass. 367, 369–370; Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U. of P. L. Rev. 797, 824–828; note 45 Cal. L. Rev. 212, 213. Cf. *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 366, where the United States was a party. That the Treasury regulations, found in 31 CFR § 306.95 (a), indicate a general policy of promoting the marketability of these certificates is not sufficient ground for distinguishing the *Parnell* case. No provision of the regulations prescribes anything with respect to either the burden of proof of ownership or the good faith of a person taking such Federal securities. Cf. *Reynolds* v. *Reynolds,* 325 Mass. 257, 262–264. The case is to be determined in accordance with the law of Massachusetts.

2. This action is governed by G. L. c. 107. See esp. § 82.[2] City Bank contends, upon the basis of *Filosi* v. *Crossman,* 111 Conn. 178, 184–185, that § 82 does not apply where the action is for conversion of the certificate rather than upon the instrument itself. The *Filosi* case seems contrary to the result reached in *Fillebrown* v. *Hayward,* 190 Mass. 472, 481–482, and to general authority elsewhere. We do not follow it. See *Crittenden* v. *Widrevitz,* 272 Fed. 871, 873–874 (2d Cir.), cert. den. 257 U. S. 636; *McCollum* v. *Graber,* 207 Ark. 1053, 1055–1059. See *Hunt* v. *Green,* 271 Ill. App. 228, 233; *Mitchell* v. *Swesnik,* 324 Ill. App. 314, app. den. 326 Ill. App. xv; *United States Fid. & Guar. Co.* v.

---

[2] Section 82, which is § 59 of the Uniform Negotiable Instruments Law (N. I. L.), was repealed by St. 1957, c. 765, § 2, and the enactment (by § 1) of the Uniform Commercial Code, effective October 1, 1958. See c. 765, § 21. The present comparable provision is G. L. c. 106, § 3–307 (3). See comment on 1957 Official Text of the Code, p. 282.

*Goetz,* 285 N. Y. 74, 78–79; *Harter* v. *People's Bank,* 221 App. Div. (N. Y.) 122, 126–127; *Warren* v. *Smith,* 35 Utah, 455, 459–460. See also *Paine* v. *St. Paul Union Stockyards Co.* 28 F. 2d 463, 464, *S. C.* 35 F. 2d 624 (8th Cir.); Goodrich, J. (dissenting) in *Bank of America Natl. Trust & Sav. Assn.* v. *Rocco,* 226 F. 2d 297, 303, 306 (3d Cir.), revd. sub. nom. *Bank of America Natl. Trust & Sav. Assn.* v. *Parnell,* 352 U. S. 29, 32–34. Section 82 applies despite the circumstance that the bonds were government bearer bonds. See *Fidelity & Deposit Co.* v. *Taunton,* 303 Mass. 176, 178 (municipal bond); *Cohn* v. *Taunton,* 303 Mass. 182, 183; *National Sur. Corp.* v. *List,* 308 Mass. 539, 542 (municipal bond). See also G. L. c. 107, § 23; *Pratt* v. *Higginson,* 230 Mass. 256, 258–259. Cf. *Wyer* v. *Dorchester & Milton Bank,* 11 Cush. 51, 53–55 (bank note).

General Laws c. 107, § 82, reads, "Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course. . . ." In Massachusetts, under § 82, the party contending that a defect in title exists has the burden of establishing the existence of the defect. See *Beacon Trust Co.* v. *Ryder,* 273 Mass. 573, 575–576; *Gramatan Natl. Bank & Trust Co.* v. *Moody,* 326 Mass. 367, 370–371. Where such a defect is established, then the holder has the burden, in the sense of the ultimate burden of persuasion (and not merely the burden of going forward with evidence), "of proving that he was a holder in due course." See *Phillips* v. *Eldridge,* 221 Mass. 103, 104; *Back Bay Natl. Bank* v. *Brickley,* 254 Mass. 261, 268; *Granlund* v. *Saraf,* 263 Mass. 76, 81; *Dodge* v. *Bowen,* 264 Mass. 208, 214–215. See also *Commercial Trust Co.* v. *Kealey,* 92 F. 2d 397, 402 (4th Cir.). If the jury believed, as they obviously did, the ample evidence that the certificate had been stolen, the thief had a defective title. Under § 82, the thief was a person "who . . . [had] negotiated the instrument." Thus, City Bank then had the ultimate burden of proof that it was a holder in due course.

We do not understand the *Beacon Trust Co.* case to modify the rule[3] laid down in *Phillips* v. *Eldridge, supra.* City Bank, however, places some reliance upon *Standard Acceptance Corp.* v. *Chapin,* 277 Mass. 278, 279, 281, and the *Gramatan Natl. Bank* case, 326 Mass. 367, 371, in each of which a verdict was entered for a holder who had the ultimate burden of proof of absence of bad faith. In the *Gramatan* case "most of . . . [the facts] were not in dispute" and the "very most that could have been found" was that the holder "had grounds for" suspicion. In the *Standard Acceptance Corp.* case (where § 82 was not discussed in the briefs or the decision) it would seem that the court concluded that very complete evidence of what actually occurred, even viewed in its aspect most adverse to the holder's position, did "not justify a finding of bad faith." We accept these decisions as establishing the possibility that upon occasion a verdict may be ordered for the holder where, upon all rational views of a fully described transaction, no inference of bad faith can reasonably be drawn. See Honigman, Proof of Good Faith, 23 Mich. L. Rev. 870, 876–879.

3. The crucial issue is whether City Bank took the certificate of indebtedness in good faith so that it became a holder in due course under G. L. c. 107, §§ 75, 79 (N. I. L. §§ 52, 56).[4] In *Fillebrown* v. *Hayward,* 190 Mass. 472, 480, it was said, "[N]either knowledge of suspicious circumstances, nor doubts as to the genuineness of the title, nor

[3] The rule has been the subject of adverse criticism. See Chafee, Progress of the Law—Bills and Notes, 33 Harv. L. Rev. 255, 274; Beutel's Brannan, Negotiable Instruments Law (7th ed.) 859, 876–877, 880–881; note, 32 Harv. L. Rev. 729. Cf. Note, 80 U. of P. L. Rev. 717. These authorities, however, indicate that only a minority of jurisdictions limit the holder's burden to one of going forward with evidence.

[4] Section 75 reads, "A holder in due course is a holder who has taken the instrument . . . in good faith and for value . . . [and] at the time it was negotiated to him . . . had no notice of any . . . defect in the title of the person negotiating it." Section 79 reads, "To constitute notice of . . . [a] defect in the title of the person negotiating the same the person to whom it is negotiated must have had actual knowledge of the . . . defect, or *knowledge of such facts that his action in taking the instrument amounted to bad faith*" (emphasis supplied). See for comparable provisions of the Uniform Commercial Code, G. L. c. 106, §§ 3–302, 3–304, 1–201 (25).

gross negligence on the part of the taker either singly or together are sufficient to defeat the holder's recovery, unless amounting to proof of want of good faith.'' This court (at p. 482) indicated that the test on this issue of fact was whether the taker of the instrument ''knew, or in the face of facts sufficient to put her upon inquiry purposely refrained from knowing[,] of the fraud'' affecting the instrument. See *Smith* v. *Livingston,* 111 Mass. 342, 343 (where the trial judge, in a charge which this court regarded as correct in general, said ''that there might be such recklessness as would be inconsistent with honesty of purpose''); *Reynolds* v. *Park Trust Co.* 245 Mass. 440, 446 (although an ''investigation . . . would have shown . . . [fraud, the holder was] not bound to make'' one); *Russell* v. *Bond & Goodwin Inc.* 276 Mass. 458, 463–464 (''Suspicion . . . was not the equivalent of knowledge which would show bad faith''); *Standard Acceptance Corp.* v. *Chapin,* 277 Mass. 278, 282 (that ''the would-be seller of a negotiable instrument is unscrupulous and has been concerned in . . . illegal transactions is not enough''); *Macklin* v. *Macklin,* 315 Mass. 451, 455 ('' [t]he rights of a holder . . . are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence''); *Gramatan Natl. Bank & Trust Co.* v. *Moody,* 326 Mass. 367, 371. In view of these decisions, the test in the present case, based upon the language of the *Fillebrown* case at p. 482, is whether the jury could reasonably infer that the group acting for City Bank knew ''facts sufficient to put . . . [it] upon inquiry [and] purposely refrained'' from inquiring or from knowing about other facts which would have revealed the lack of title in Shapiro's client.

4. City Bank was not entitled to a directed verdict. Assuming that City Bank was a holder in due course to the extent of amounts already paid to Shapiro from the ''Special'' account before it learned of the theft, it was not one with respect to the amounts then remaining in the checking account. G. L. c. 107, § 77 (N. I. L. § 54). See *Merchants Natl. Bank* v. *Marden, Orth & Hastings Co.* 234

Mass. 161, 170, annotation, 59 A. L. R. 2d 1173, 1176, 1184. See also *Boston-Continental Natl. Bank* v. *Hub Fruit Co.* 285 Mass. 187, 189. The motion for a directed verdict was general. Because in any event it could not be allowed as to the amount remaining in the checking account, it was properly denied. See *Shumway* v. *Home Fire & Marine Ins. Co.* 301 Mass. 391, 396–397; *Trites* v. *Melrose,* 318 Mass. 378, 380.

We do not, however, place our approval of the trial judge's refusal to direct a verdict solely upon the narrow ground just mentioned. There was sufficient evidence to warrant submitting to the jury the issue whether City Bank took the bond in good faith.

The jury could have found that Swift and Epstein were told that the certificate was owned by Shapiro's client and that Swift knew that the deposit of proceeds was to be "opened as 'Special' as . . . client's money." Shapiro thus purported to be pledging a client's security for a personal loan. The judge correctly told the jury that they should consider whether knowledge of ownership of the bond by a client, when it was being pledged by Shapiro "for . . . a loan to himself," so called for inquiry that failing to make it tended to show bad faith. Although the proceeds of the loan were to go temporarily into a special account, the great bulk of the funds were to be withdrawn, and were withdrawn, in cash promptly. The knowledge of the client's interest, at least in respect of any interest of that client, imposed a duty upon City Bank "to ascertain whether the . . . [certificate] could be used legally as collateral security for" Shapiro's own debt. See *Brooks* v. *Davis,* 294 Mass. 236, 247; Restatement 2d: Trusts, § 297; Scott, Trusts (2d ed.) § 297.6. No inquiries were made by City Bank's officers as to Shapiro's authority to pledge the certificate for a loan to himself.

Shapiro was a stranger to City Bank when the loan was made, although introduced by Marks, one of City Bank's

directors.[5]   Marks did not say, ''This man is a friend of mine, and . . . owns this . . . bond.''   He was not shown to have done more than to introduce him.   The jury had before them expert testimony that First National would not have made the loan to one (even if introduced by a director) who had indicated that the certificate belonged to another. It was known to officers of City Bank that the certificate could have been sold promptly elsewhere for cash, whereas borrowing would be at a rate of interest above that accruing on the certificate.   Swift, an officer of City Bank, knew that Shapiro, instead of taking a cashier's check to transmit funds to his client, ran the risk of transporting currency in packets of three hundred $100 bills.   This the jury could reasonably regard as so unusual as to indicate that Shapiro did not wish to have the transaction traced.   As to withdrawals later made from the checking account, City Bank's teller could have been found to have known that Shapiro described himself as a diamond merchant who needed cash, at a time when his signature card showed him to be a genealogist and when other City Bank officers knew that Shapiro was borrowing on his own note secured by what he said was a client's collateral.

The jury, of course, could reasonably have concluded that City Bank for an interest return of only some $1,200 would have been unlikely to take the risk of becoming a converter of a $100,000 bond and of losing the security for its loan. They could have found that the action of the bank and its officers was consistent with good faith, even if grossly unbusinesslike.   Nevertheless, the jury, who saw and heard City Bank's officers, were not bound so to decide.   The extraordinary circumstances of this loan could reasonably have been regarded as ample to cause serious alarm to any

---

5 Marks could have been found to have been acting for the bank in obtaining this very business, and under a duty to advise the bank of what he knew of Shapiro and of the serious limitations upon that knowledge.   See *National Sec. Bank* v. *Cushman*, 121 Mass. 490, 491–492; Restatement 2d: Agency, §§ 9, 272, 275 (but cf. § 14C); Merrill, Notice, § 1221; Fletcher, Cyc. Corpns. § 808. See also *New England Trust Co.* v. *Bright*, 274 Mass. 407, 412–413 (employee). Cf. *Frost* v. *Belmont*, 6 Allen, 152, 162–163; *Buckman* v. *Elm Hill Realty Co. of Peabody*, 312 Mass. 10, 15–16.

competent lending officer of even a new bank, as not being
regular and in the ordinary course of business.   See Good-
rich, J., in *Bank of America Natl. Trust & Sav. Assn.* v.
*Rocco,* 226 F. 2d 297, 307, *supra.*   The jury had adequate
basis in the evidence for inferring that City Bank's officers
incorrectly appraised as slight the risk of dealing with
Shapiro; and that, with a view to preserving a profitable
piece of business, they refrained from inquiry with a reck-
less disregard of the obvious which constituted bad faith.
Even if the test as to notice and absence of bad faith is the
subjective test of honesty and not the objective test of dili-
gence, the circumstances of which the bank could have been
found to have had knowledge permitted the jury to infer
that the bank's conduct, in disregard of sound banking
standards, was something more than gross ignorance and
negligence.

5.   Shapiro was permitted to testify, subject to City
Bank's exception,[6] (1) about his conversations with Serano
and with Goldman, (2) about the $1,500 loan which he made
to Goldman, and (3) about a $11,000 fee taken for his own
work.   The judge also admitted, subject to exception, testi-
mony of Goldman (a) about a conversation with the presi-
dent of Middlesex County National Bank that his bank
"was not in a position to handle that kind of bond or, at
that time, to do anything with a bond of that size"; and
(b) about the $1,500 loan to him.   City Bank's counsel
stated that his objection was to admitting this testimony on
the issue of bad faith on the part of City Bank, although he
did not object to receiving the testimony upon the issue of
Shapiro's lack of title to the certificate.   City Bank season-
ably excepted to the denial of its request to limit the use of
the testimony, made when the testimony was given and also
later renewed.   Exception was also taken to the testimony
that Shapiro was a disbarred lawyer and to Foley's testi-
mony about Shapiro's statement that he was a diamond

[6] Somewhat blind statements in the bill of exceptions that City Bank's
objections were "withdrawn" at particular points, we construe in context as
applying only to testimony given following the withdrawal and not as waiving
objections to testimony theretofore given.

merchant. This statement was not made until after the
first $30,000 had been withdrawn from the checking ac-
count. It was not shown that City Bank officers knew,
prior to any of Shapiro's withdrawals of cash from the
bank account, (1) about the matters discussed by Shapiro
and Goldman and by Goldman and his banker, (2) that
Shapiro had made the $1,500 loan, or (3) that Shapiro was
a disbarred lawyer. City Bank objected to all the testi-
mony described above on the ground that it referred to mat-
ters which took place, or became known to City Bank, only
after credit had been extended to Shapiro. If this testi-
mony was not admissible on the issue of City Bank's good
faith, the harm was not removed by the charge. Indeed,
the judge specifically mentioned Goldman's effort to obtain
a loan from the Middlesex County National Bank and
Shapiro's loan to Goldman as factors at least indirectly
bearing upon City Bank's ''innocence and title to that
bond.''

It is possible that some of this damaging information
would have been discovered if City Bank had made an in-
vestigation to determine whether Shapiro was authorized
by his client to pledge the bond to secure his own note.
Elbar argues (see *Allen* v. *Puritan Trust Co.* 211 Mass. 409),
421; cf. *Banks* v. *Everett Natl. Bank,* 305 Mass. 178, 181–
182; *Boston Note Brokerage Co. Inc.* v. *Pilgrim Trust Co.*
318 Mass. 224, 227–228) in effect that the disputed evidence
was admissible because it showed facts which City Bank
would have discovered if it had pushed such an inquiry.
City Bank, if it had investigated, would probably have
found that Shapiro was indeed authorized by his client to
pledge the bond. That other significant facts would have
been discovered, however, is collateral to the issue of good
faith.

We assume that, if the disputed evidence had been clearly
limited to showing that inquiry would not have been futile,
and to its bearing on Shapiro's own title, its admission
would not have been prejudicial. On the issue of City
Bank's good faith, however, only what City Bank actually

knew is significant in appraising whether it was acting honestly. See *Reynolds* v. *Park Trust Co.* 245 Mass. 440, 446; *Russell* v. *Bond & Goodwin Inc.* 276 Mass. 458, 464. That Shapiro was pledging a client's bond for his own debt gave notice to the bank of risks and dangers and of an obligation to investigate. That City Bank did not investigate in accordance with good banking practice, when it had this knowledge, warranted an inference by the jury that it was deliberately avoiding discovering the facts which an investigation might reveal. Its good faith, however, was not affected by facts of which it had no knowledge at any pertinent moment. The disputed evidence should have been limited to the issues on which it had relevance as City Bank sufficiently requested. It was not relevant on the issue of good faith and may seriously have affected the jury's judgment on that issue.

6. Our disposition of City Bank's exceptions to the failure to limit the evidence just mentioned makes it unnecessary to consider City Bank's other exceptions concerning issues of law which either have been sufficiently discussed above or are unlikely to arise at a new trial. These include exceptions to the charge, to the refusal of requested instructions, and to the denial of a mistrial because of a question whether Elbar carried theft insurance, the answer to which (because irrelevant or likely to be prejudicial) the judge in his discretion seems properly to have struck from the record. See *Gladney* v. *Holland Furnace Co.* 336 Mass. 366, 368.

*Exceptions sustained.*