**BOWLING GREEN, INC., Plaintiff, Appellant,**

v.

**STATE STREET BANK AND TRUST COMPANY, Defendant, Appellee.**

**No. 7475.**

United States Court of Appeals, First Circuit.

May 6, 1970.

Marcus E. Cohn, Boston, Mass., with whom Bernard P. Rome and Wasserman & Salter, Boston, Mass., were on brief, for appellant.

Charles C. Craig, Boston, Mass., with whom Craig & Craig, Boston, Mass., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

On September 26, 1966, plaintiff Bowling Green, Inc., the operator of a bowling alley, negotiated a United States government check for $15,306 to Bowl-Mor, Inc., a manufacturer of bowling alley equipment. The check, which plaintiff had acquired through a Small Business Administration loan, represented the first installment on a conditional sales contract for the purchase of candlepin setting machines. On the following day, September 27, a representative of Bowl-Mor deposited the check in defendant State Street Bank and Trust Co. The Bank immediately credited $5,024.85 of the check against an overdraft in Bowl-Mor's account. Later that day, when the Bank learned that Bowl-Mor had filed a petition for reorganization under Chapter X of the Bankruptcy Act, it transferred $233.61 of Bowl-Mor's funds to another account and applied the remaining $10,047.54 against debts which Bowl-Mor owed the Bank. Short-

ly thereafter, Bowl-Mor's petition for reorganization was dismissed and the firm was adjudicated a bankrupt. Plaintiff has never received the pin-setting machines for which it contracted. Its part payment remains in the hands of defendant Bank.

Plaintiff brought this diversity action to recover its payment from defendant Bank on the grounds that the Bank is constructive trustee of the funds deposited by Bowl-Mor. In the court below, plaintiff argued that Bowl-Mor knew it could not perform at the time it accepted payment, that the Bank was aware of this fraudulent conduct, and that the Bank therefore received Bowl-Mor's deposit impressed with a constructive trust in plaintiff's favor. The district court rejected plaintiff's view of the evidence, concluding instead that the Bank was a holder in due course within the meaning of Mass.Gen.Laws Ann. c. 106 §§ 4–209 and 3–302, and was therefore entitled to take the item in question free of all personal defenses. Bowling Green, Inc., etc. v. State Street Bank and Trust Co., 307 F.Supp. 648 (D.Mass.1969).

Plaintiff's appeal challenges the conclusion of the district court in three respects. First, plaintiff maintains that the Bank has not met its burden of establishing that it was a "holder" of the item within the meaning of Mass.Gen. Laws Ann. c. 106 § 1–201(20), and thus cannot be a "holder in due course" within the meaning of § 4–209 and § 3–302.[1] Second, plaintiff argues that the Bank's close working relation with Bowl-Mor

prevented it from becoming a holder in good faith. Finally, plaintiff denies that defendant gave value within the meaning of § 4–209 for the $10,047.54 which it set off against Bowl-Mor's loan account.

Plaintiff's first objection arises from a technical failure of proof. The district court found that plaintiff had endorsed the item in question to Bowl-Mor, but there was no evidence that Bowl-Mor supplied its own endorsement before depositing the item in the Bank. Thus we cannot tell whether the Bank is a holder within the meaning of § 1–201(20), which defines holder as one who takes an instrument endorsed to him, or to bearer, or in blank. But, argues plaintiff, once it is shown that a defense to an instrument exists, the Bank has the burden of showing that it is in all respects a holder in due course. This failure of proof, in plaintiff's eyes, is fatal to the Bank's case.

■■ We readily agree with plaintiff that the Bank has the burden of establishing its status in all respects. Mass.Gen.Laws Ann. c. 106 § 3–307(3),[2] on which plaintiff relies to establish the defendant's burden, seems addressed primarily to cases in which a holder seeks to enforce an instrument, but Massachusetts courts have indicated that the policy of § 3–307(3) applies whenever a party invokes the rights of a holder in due course either offensively or defensively. *Cf.* Elbar Realty Inc. v. City Bank & Trust Co., 342 Mass. 262, 267–268, 173 N.E.2d 256 (1961). The

---

1. Mass.Gen.Laws Ann. c. 106 § 4–209.

"*When Bank gives Value for Purposes of Holder in Due Course.* For purposes of determining its status as a holder in due course, the bank has given value to the extent that it has a security interest in an item provided that the bank otherwise complies with the requirements of section 3–302 on what constitutes a holder in due course."

Mass.Gen.Laws Ann. c. 106 § 3–302.

"*Holder in Due Course.*

(1) A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. * * * "

2. Mass.Gen.Laws Ann. c. 106 § 3–307.

"*Burden of Establishing Signatures, Defenses and Due Course.* * * *

(3) After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course."

issue, however, is not whether the Bank bears the burden of proof, but whether it must establish that it took the item in question by endorsement in order to meet its burden. We think not. The evidence in this case indicates that the Bank's transferor, Bowl-Mor, was a holder. Under Mass.Gen.Laws Ann. c. 106, § 3–201(a), transfer of an instrument vests in the transferee all the rights of the transferor. As the Official Comment to § 3–201 indicates, one who is not a holder must first establish the transaction by which he acquired the instrument before enforcing it, but the Bank has met this burden here.

■■■ We doubt, moreover, whether the concept of "holder" as defined in § 1–201(20) applies with full force to Article 4. Article 4 establishes a comprehensive scheme for simplifying and expediting bank collections. Its provisions govern the more general rules of Article 3 wherever inconsistent. Mass.Gen. Laws Ann. c. 106 § 4–102(1). As part of this expediting process, Article 4 recognizes the common bank practice of accepting unendorsed checks for deposit. See Funk, Banks and the UCC 133 (1964). § 4–201(1) provides that the lack of an endorsement shall not affect the bank's status as agent for collection, and § 4–205(1) authorizes the collecting bank to supply the missing endorsements as a matter of course.[3] In practice, banks comply with § 4–205 by stamping the item "deposited to the account of the named payee" or some similar formula. Funk, *supra* at 133. We doubt whether the bank's status should turn on proof of whether a clerk employed the appropriate stamp, and we hesitate to penalize a bank which accepted unendorsed checks for deposit in reliance on the Code, at least when, as here, the customer himself clearly satisfies the definition of "holder". Section 4–209 does provide that a bank must comply "with the requirements of section 3–302 on what constitutes a holder in due course," but

we think this language refers to the enumerated requirements of good faith and lack of notice rather than to the status of holder, a status which § 3–302 assumes rather than requires. We therefore hold that a bank which takes an item for collection from a customer who was himself a holder need not establish that it took the item by negotiation in order to satisfy § 4–209.

Plaintiff's second objection arises from the intimate relationship between Bowl-Mor and the Bank, a relationship which plaintiff maintains precludes a finding of good faith. The record shows that the Bank was one of Bowl-Mor's three major creditors, and that it regularly provided short term financing for Bowl-Mor against the security of Bowl-Mor's inventory and unperformed contracts. The loan officer in charge of Bowl-Mor's account, Francis Haydock, was also a director of Bowl-Mor until August 1966. Haydock knew of Bowl-Mor's poor financial health and of its inability to satisfy all its creditors during 1966. In the five months before the transaction in question, the Bank charged $1,000,000 of Bowl-Mor's debt to the Bank's reserve for bad debts. However, the record also shows that the Bank continued to make loans to Bowl-Mor until September 12.

The Bank was also aware of the underlying transaction between Bowl-Mor and the plaintiff which led to the deposit on September 26. During the week prior to this transaction, Bowl-Mor had overdrawn its checking account with the Bank to meet a payroll. In order to persuade the Bank to honor the overdraft, officials of Bowl-Mor contacted Haydock and informed him that a check for $15,000 would be deposited as soon as plaintiff could obtain the funds from the Small Business Administration. The district court found, however, that the Bank was not aware that the directors of Bowl-Mor had authorized a Chapter

---

**3.** *See also* § 4–105(a), which defines "depositary bank" in terms of transfer rather than negotiation, and § 4–206, which speaks of transfer between banks. For the difference between transfer and negotiation, compare § 3–201 with § 3–202(1).

X petition or that Bowl-Mor officials planned to file the petition on September 27.

■ On the basis of this record, the district court found that the Bank acted in good faith and without notice of any defense to the instrument. The Code defines "good faith" as "honesty in fact", Mass.Gen.Laws Ann. c. 106 § 1–201(19), an essentially subjective test which focuses on the state of mind of the person in question. The Code's definition of "notice", Mass.Gen.Laws Ann. c. 106 § 1–201(25), while considerably more prolix, also focuses on the actual knowledge of the individuals allegedly notified. Since the application of these definitions turns so heavily on the facts of an individual case, rulings of a district court under §§ 3–302(1) (b) and 3–302(1) (c) should never be reversed unless clearly erroneous. In this case, the evidence indicated that Bowl-Mor had persevered in spite of long-term financial ill health, and that the event which precipitated its demise was the withdrawal of financial support by another major creditor, Otis Elevator Co., on the morning of September 27, after the deposit of plaintiff's check. Thus, at the time of deposit, the Bank might reasonably have expected Bowl-Mor to continue its shambling pace rather than cease business immediately. The findings of the district court are not, therefore, clearly erroneous.

Plaintiff, however, urges us to adopt the "objective" standard of good faith promulgated in Jones v. Approved Bancredit Corp., 256 A.2d 739 (Del.Sup.Ct. 1969), which held that a finance company could not as a matter of law be a holder in due course of a consumer installment note which it discounted for a closely affiliated construction company. We doubt whether *Approved Bancredit* represents the law in Massachusetts. In a similar case, Universal C.I.T. Credit Corp. v. Ingel, 347 Mass. 119, 196 N.E. 2d 847 (1964), the consumer sought to introduce evidence concerning the credit company's cooperation with the payee of the note in arranging financing and the company's knowledge of previous complaints concerning the payee's performance. The Supreme Judicial Court held that such evidence was properly excluded because it did not establish that the credit company had notice of the payee's fraud. 347 Mass. at 125, 196 N.E.2d 847. While this decision is not squarely addressed to good faith, it indicates to us that Massachusetts continues to look to the facts of the individual case rather than applying an "objective standard" based on the general business dealings between the transferor and transferee of an instrument.[4]

■ We note, moreover, that the balance of convenience on which the Delaware Court relied in *Approved Bancredit* inclines in a different direction when the instrument is a check rather than a consumer note. A consumer who executes a note often has no way of investigating the honesty of the person with whom he deals and his only realistic remedy in the event of breach is to withhold payment. A bank or finance company, on the other hand, will find it relatively easy to check the honesty and competence of those who regularly present consumer paper for discounting. When the instrument is a check, however, the equities are quite different. The check is the major method for transfer of funds in commercial practice. The maker, payee, and endorsers of a check naturally expect it will be rapidly negotiated and collected. Even companies which, like Bowl-Mor, are tottering on the brink of financial collapse will continue to deposit checks for collection during each business day. The wheels of commerce would grind to a halt if the bank became "constructive trustee" of these items at the first whiff of insolvency. We therefore see no suffi-

4. Massachusetts has handled the problem of consumer credit by legislatively banning the use of negotiable instruments in installment sales of consumer goods. Mass. Gen.Laws Ann. c. 255 § 12C (Supp. 1969).

cient reason not only to adopt the objective standard but also to extend it to a commerical bank accepting a check.

This brings us to plaintiff's final argument, that the Bank gave value only to the extent of the $5,024.85 overdraft, and thus cannot be a holder in due course with respect to the remaining $10,047.54 which the Bank credited against Bowl-Mor's loan account. Our consideration of this argument is confined by the narrow scope of the district court's findings. The Bank may well have given value under § 4–208(1) (a) when it credited the balance of Bowl-Mor's checking account against its outstanding indebtedness. *See* Banco Espanol de Credito v. State Street Bank & Trust Co., 409 F.2d 711 (1st Cir. 1969). But by that time the Bank knew of Bowl-Mor's petition for reorganization, additional information which the district court did not consider in finding that the Bank acted in good faith and without notice at the time it received the item. We must therefore decide whether the Bank gave value for the additional $10,047.54 at the time the item was deposited.[5]

Resolution of this issue depends on the proper interpretation of § 4–209, which provides that a collecting bank has given value to the extent that it has acquired a "security interest" in an item. In plaintiff's view, a collecting bank can satisfy § 4–209 only by extending credit against an item in compliance with § 4–208(1).[6] The district court, on the other hand, adopted the view that a security interest is a security interest, however acquired. The court then found that defendant and Bowl-Mor had entered a security agreement which gave defendant a floating lien on Bowl-Mor's chattel paper. Since the item in question was part of the proceeds of a Bowl-Mor contract, the court concluded that defendant had given value for the full $15,306.00 at the time it received the deposit.

With this conclusion we agree. Section 1–201(37) defines "security interest" as an interest in personal property which secures payment or performance of an obligation. There is no indication in § 4–209 that the term is used in a more narrow or specialized sense. Moreover, as the official comment to § 4–209 observes, this provision is in accord with prior law and with § 3–303, both of which provide that a holder gives value when he accepts an instrument as security for an antecedent debt. Reynolds v. Park Trust Co., 245 Mass.

---

5. Defendant suggests that we can avoid the analytical problems of § 4–209 by simply holding that the Bank's inchoate right to set off Bowl-Mor's outstanding indebtedness against deposits, as they were made constituted a giving of value. *See* Wood v. Boylston National Bank, 129 Mass. 358 (1880). There are, however, some pitfalls in this theory. First, under prior law a secured creditor could not exercise its right of set-off without first showing that its security was inadequate. Forastiere v. Springfield Institution for Savings, 303 Mass. 101, 104, 20 N.E.2d 950 (1939). Second, although the Uniform Commercial Code forswears any intent to change a banker's right of set-off, § 4–201 does change the presumption that a bank owns items deposited with it. This presumption played a role under prior law in assessing the bank's rights against uncollected commercial paper. *Compare* Wood v. Boylston National Bank, *supra*, with Boston-Continental National Bank v.

Hub Fruit Co., 285 Mass. 187, 190, 189 N.E. 89 (1934) and American Barrel Co. v. Commissioner of Banks, 290 Mass. 174, 179–181, 195 N.E. 335 (1935).

6. Mass.Gen.Laws Ann. c. 106, § 4–208. *"Security Interest of Collecting Bank in Items, Accompanying Documents and Proceeds.* (1) A bank has a security interest in an item and any accompanying documents or the proceeds of either

(a) in case of an item deposited in an account to the extent to which credit given for the item has been withdrawn or applied;

(b) in case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given whether or not the credit is drawn upon and whether or not there is a right of charge-back; or

(c) if it makes an advance on or against the item. * * * *"

440, 444–445, 139 N.E. 785 (1923). Finally, we note that if one of the Bank's prior loans to Bowl-Mor had been made in the expectation that this particular instrument would be deposited, the terms of § 4–208(1) (c) would have been literally satisfied. We do not think the case is significantly different when the Bank advances credit on the strength of a continuing flow of items of this kind. We therefore conclude that the Bank gave value for the full $15,306.00 at the time it accepted the deposit.

We see no discrepancy between this result and the realities of commercial life. Each party, of course, chose to do business with an eventually irresponsible third party. The Bank, though perhaps unwise in prolonging its hopes for a prospering customer, nevertheless protected itself through security arrangements as far as possible without hobbling each deposit and withdrawal. Plaintiff, on the other hand, not only placed its initial faith in Bowl-Mor, but later became aware that Bowl-Mor was having difficulties in meeting its payroll. It seems not too unjust that this vestige of caveat emptor survives.

Affirmed.