**BOWLING GREEN, INC. OF SOMERS-WORTH, NEW HAMPSHIRE,**
Plaintiff,

v.

**STATE STREET BANK AND TRUST COMPANY OF BOSTON, MASSA-CHUSETTS, Defendant.**

Civ. A. No. 67-458.

United States District Court
D. Massachusetts.

Sept. 30, 1969.

Bernard P. Rome, Marcus E. Cohn, Wasserman & Salter, Boston, Mass., for plaintiff.

Charles C. Craig, Craig & Craig, Boston, Mass., for defendant.

MEMORANDUM

FRANK J. MURRAY, District Judge.

This is a diversity action seeking to hold defendant State Street Bank and Trust (the "Bank") as constructive trustee of certain funds. The action was tried to the court without a jury. At the close of plaintiff's case, defendant moved to dismiss the action under Fed.R.Civ.P. 41(b). Defendant offered no evidence. This memorandum contains the findings and conclusions of the court. *See* Fed.R. Civ.P. 52(a).

On August 24, 1966 Bowling Green, Inc. (plaintiff) entered into a conditional sale contract with Bowl-Mor Company, Inc., a corporation not a party to this action. Under the contract, plaintiff agreed to purchase and Bowl-Mor agreed to sell fourteen automatic candlepin setting machines for a price of $45,920.00. The balance was payable in three instalments, the first in the amount of $15,306.00 due on August 31, 1966. That payment was not made when due, and representatives of Bowl-Mor inquired frequently over the next couple of weeks as to when it would be made.

On Monday, September 26, 1966, the first instalment was paid by a check in the amount of $15,306.00 indorsed by plaintiff to Bowl-Mor [1] and drawn by the Small Business Administration on the United States pursuant to a loan agreement with plaintiff. A representative of Bowl-Mor had told plaintiff's president that the check was needed to meet Bowl-Mor's payroll. The closing for plaintiff's Small Business Administration loan was held in Concord, New Hampshire on that day, and the check was given to a representative of Bowl-Mor present at the closing. Bowl-Mor's representative had told plaintiff that no delivery of the machines could be made until the check for the first instalment was received.

---

1. The parties stipulated that the check "was to be endorsed over to Bowl-Mor". Stipulated Fact No. 12. No evidence was offered inconsistent with that stipulation, and it provides sufficient basis for finding that the check was indorsed by Bowling Green to Bowl-Mor.

The check was taken from Concord and delivered late Monday afternoon to one Berriman who had served as Bowl-Mor's treasurer for at least a year and a half prior to this time. Bowl-Mor had a payroll due the preceding Friday. On Wednesday, September 21, Berriman drew a Bowl-Mor check on defendant Bank in the amount of $22,958.28 to cover Bowl-Mor's payroll account with another bank. The check was cleared through the Federal Reserve Bank of Boston and received by defendant Bank on Friday. On that day defendant Bank notified Bowl-Mor that there were insufficient funds in its account to cover the check. Bowl-Mor told the Bank that it would receive plaintiff's check on the following Monday and would deposit it at that time, and that it would remove the overdraft. On Monday, Berriman called one Haydock, a vice-president of defendant Bank and the loan officer in charge of Bowl-Mor's loan accounts with the Bank, to tell him that he (Berriman) could not get to the Bank with the check before closing time on that day. Haydock was told where the check was coming from. Berriman asked Haydock to permit him to deposit the check at the start of business the next day (Tuesday). Haydock assented, and the check was given to Haydock and deposited in Bowl-Mor's checking account at the start of business on Tuesday.

When Bowl-Mor deposited plaintiff's check, a credit, traceable to the check, of $5,024.85 removed the then-existing overdraft, and a credit balance of $10,047.54 traceable to that check remained in Bowl-Mor's checking account.

At 3:30 p. m. on Tuesday a petition for reorganization under Chapter X of the Bankruptcy Act was filed in this court by Bowl-Mor. Upon learning of the filing of the petition, the Bank credited Bowl-Mor's loan account with the $10,-047.54 balance remaining in the checking account. On the next day the Bank, acting on the request of the receiver appointed in the Chapter X proceeding, withdrew the $10,047.54 credit from the loan account and credited the checking

account with that sum. Six days later, the Chapter X petition was ordered dismissed by a Judge of this court. Shortly after that petition was dismissed, the Bank again credited Bowl-Mor's loan account with the $10,047.54 balance in the checking account. An involuntary bankruptcy petition was filed against Bowl-Mor on October 24, 1966. Bowl-Mor filed a petition for an arrangement under Chapter XI of the Bankruptcy Act on November 7, 1966. Bowl-Mor was adjudicated bankrupt on February 15, 1967. Bowl-Mor never performed any part of its contract with plaintiff, and plaintiff neither tendered nor paid any further instalments.

At the trial, the arguments of the parties were largely focussed on the question whether, under general equity jurisprudence, the Bank could be held as a constructive trustee of all or part of the check's proceeds. The court thereafter set the action down for rehearing and requested argument on the following questions:

1. Does the Uniform Commercial Code (Mass.Gen.Laws chapter 106, section 1–101 et seq.), hereinafter "UCC", govern the disposition of this action?

2. Assuming an affirmative answer to question 1, had the defendant State Street Bank and Trust Company given "value" for the Small Business Administration check under UCC sections 3–303(b) and/or 4–209 such that it satisfied the requirement that a "holder in due course" take "for value" under UCC section 3–302(1) (a)?

I. Applicability of the Uniform Commercial Code.

UCC section 1–103 provides as follows:

Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, du-

ress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

By its terms, section 1–103 permits reference to general equity principles only if they are not "displaced by the particular provisions of this Act". The "Act" is the entire Code. UCC section 1–101. The Code expresses the public policy of this Commonwealth as follows:

(1) This Act shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of this Act are

(a) to simplify, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions.

UCC section 1–102(1).

The controversy between the parties centers on the bank's conduct with respect to a negotiable instrument within the general purview of the Code, UCC section 3–104, and the conduct of a bank in handling a check is regulated by Article 4. Moreover, UCC section 3–207 (2)[2] specifically recognizes the constructive trust remedy urged by plaintiff, but at least implies that the remedy cannot be asserted in a situation where the Code would endow defendant with a protected status.[3] The general subject matter of

this controversy thus falls within the scope of the Code, and the court now turns to its "particular provisions" as required by UCC section 1–103.

## II. The Depositary Bank as a "Holder in Due Course".

■ The Bank in this action was acting as a depositary bank when it received the check from Bowl-Mor. UCC section 4–105(a). Although it originally argued that it was a "purchaser for value", the important concern here is whether it was a "holder in due course" or had the rights of a "holder in due course", such that it took the check free from "all claims to it on the part of any person". UCC section 3–305(1). As used in section 3–305(1), the word "claims" includes equitable claims (UCC section 3–305, Comment 2), such as a claim of a beneficial interest in a constructive trust, and the word "person" includes a corporation such as the plaintiff (UCC section 1–201 (30), (28)).

Under section 3–302(1):

A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

"Instrument", as the term is used in the preceding quotation, includes the check involved here. *See* UCC sections

---

**2.** UCC section 3–207(2) provides as follows:

Except as against a subsequent holder in due course * * * negotiation is in an appropriate case subject to rescission, the declaration of a constructive trust or any other remedy permitted by law.

**3.** National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843, 849 (1st Cir. 1969), petition for rehearing denied, and French Lumber Co., Inc. v. Commercial Realty & Finance Co., Inc., 346 Mass. 716, 195 N.E.2d 507 (1964), holding that the enactment of the

Commercial Code did not displace the equitable doctrine of subrogation, do not require a determination that the Code does not govern disposition of this action. In *National Shawmut Bank of Boston* and *French Lumber* the courts found that Code-established priorities among creditors had nothing to do with the question whether one could be subrogated to the rights of a creditor having a priority. The instant case, however, concerns a remedy which, although clearly recognized by the Code, may be barred in the interest of not encumbering the transfer of negotiable instruments.

3–102(1) (e), 3–104(1), (2) (b); note 1 *supra*.

 On this record, there can be no question of the Bank's "honesty in fact", UCC section 1–201(19), and the court holds that the Bank took the check "in good faith" within the meaning of UCC section 3–302(1) (b).

A. The Depositary Bank as a "Holder".

 The Small Business Administration check involved here was not introduced in evidence. There is no evidence that the check was drawn or issued to the Bank. There is no evidence as to how it was indorsed by Bowl-Mor, and, indeed, there is no evidence showing that the check was indorsed by Bowl-Mor. All the evidence shows is that the check was indorsed by plaintiff to Bowl-Mor. In sum, there is no evidence to support a finding that the Bank was a "holder" within the meaning of UCC section 1–201 (20). The Bank has the burden of proof on this issue [4] and, clearly the Bank has not sustained that burden.

 Since plaintiff indorsed and delivered the Small Business Administration check to Bowl-Mor, Bowl-Mor was a "holder" of the check within the meaning of UCC section 1–201(20). Article 4 of the Code does not appear to require a depositary bank to take a check by negotiation in order to succeed to the right of its transferor as a "holder" of a check under UCC section 4–201(1). By the terms of that section, the "form of indorsement or lack of indorsement" has no impact on a depositary bank's agency status. To require that a depositary bank take a check by negotiation under the circumstances present here in order to become a holder of the check would make impractical receipt of checks without the transferor's indorsement. Yet such a practice is expressly contemplated in UCC section 4–201(1).[5] In the ab-

4. In relevant part, UCC section 3–307 provides as follows:

Section 3–307. Burden of Establishing Signatures, Defenses and Due Course

\* \* \* \* \*

(3) After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course.

In terms, the section quoted appears to apply only when a party is suing on an instrument. It speaks only to situations where defenses, rather than claims, exist. But one claiming to be a holder in due course has the ultimate burden of proof when the action is one not on the instrument but for conversion of it (El-bar Realty, Inc. v. City Bank & Trust Co., 342 Mass. 262, 173 N.E.2d 256 (1961)), ("Where such a defect is established, then the holder has the burden, in the sense of the ultimate burden of persuasion (and not merely the burden of going forward with evidence), 'of proving that he was a holder in due course'.").

As will be shown *infra* in part II(C) of this memorandum, plaintiff has demonstrated that it has an equitable claim to the check involved here. In view of UCC section 3–307(3), there does not ap-pear to be any justification for requiring a party with a claim to an instrument, rather than a defense, to prove that his adversary was not a "holder in due course". On the contrary, UCC section 3–307(3), at least when read with its unlimited caption, requires the conclusion that a party resisting a claim to an instrument on the ground of "holder in due course" status must prove this status as an affirmative defense. Of course, the fact that the Bank has not offered evidence in this case although it has the burden of proof does not require a decision for plaintiff; the question raised by defendant's motion to dismiss is whether the evidence plaintiff introduced compels a finding that defendant was a holder in due course.

5. A depositary bank may usually supply its customer's indorsement as of right. UCC section 4–205(1). Such an indorsement would be necessary if the bank were to sue its customer on the instrument. UCC section 3–401(1). It does not follow, however, that the right to indorse amounts to a requirement. It is conceivable that this right might be exercised only when suit against a customer is contemplated, a time when a depositary bank would usually have notice of a claim or defense to the instrument. Such notice would presumably defeat the

sence of any other variable, the presence or absence of the transferor's indorsement and the form thereof can have no consequence with respect to the competing claims of a depositary bank and a party with whom the bank has not dealt. *Cf.* Waltham Citizens National Bank v. Flett, 353 Mass. 696, 234 N.E.2d 739 (1968). Since the provisions of Article 4 govern inconsistent provisions of Article 3 (UCC sections 4–102(1), 3–103 (2)) to the extent that corresponding provisions are irreconcilable, a depositary bank need not comply with the negotiation requirement of indorsement of UCC section 3–202(1) to be a holder if it obtains from a holder under UCC section 3–201(1). *See* UCC section 4–205(1). In the absence of any evidence showing that Bowl-Mor's indorsement was required by the tenor of plaintiff's indorsement, the Bank acquired Bowl-Mor's rights as a "holder" when the check was deposited with it. UCC section 3–201(1). *Compare* Waltham Citizens National Bank v. Flett, 353 Mass. 696, 234 N.E.2d 739 (1968) (depositary bank held to be a holder; payee-depositor had indorsed check but form of indorsement does not appear in court's opinion); Citizens National Bank of Englewood v. Fort Lee Savings & Loan Ass'n, 89 N.J.Super. 43, 213 A.2d 315 (1965) (depositary bank held to be a holder; opinion does not show how or whether non-payee depositor indorsed check).

bank's claim under the instrument as a holder in due course (*see* UCC section 3–302(1) (c)) if the bank first became a holder when it affixed its customer's indorsement. Moreover, unlike UCC section 3–201(3), UCC section 4–205(1) contains no language indicating that the right to obtain an indorsement provided therein is a condition precedent to becoming a holder.

6. The Bank has argued that it took the entire check ($15,306.00) for value because it relied upon receiving the check in deciding to honor Bowl-Mor's $22,958.28 payroll check. The Bank could have refused to pay that check until midnight Monday, September 26. UCC sections 4–104(1) (h), 4–213(1) (d), 4–301(1).

**B. The Depositary Bank as a Holder "For Value".**

Taking for value is defined in UCC section 3–303(b) as follows:

A holder takes the instrument for value * * * when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due * * *.

On Tuesday morning, when the Bank received the check, Bowl-Mor owed it $5,024.85 because of the overdraft on the payroll check. Thus the Bank took at least $5,024.85 of the $15,306.00 check "for value" because it took that amount "in payment of * * * an antecedent" debt within the meaning of section 3–303(b). *See* Citizens Bank of Booneville v. National Bank of Commerce, 334 F.2d 257, 261 (10th Cir. 1964).

As for the remainder of the fund represented by the check,[6] the question whether the Bank took "for value" turns on whether the term "security interest", as used in UCC section 4–209, includes all security interests or only those described in UCC section 4–208. Plaintiff proved that the Bank, along with Otis Elevator Company and General Electric Credit Corporation, shared a security interest in the proceeds, products and after-acquired property of Bowl-Mor, which covered the check involved here.[7] The Bank's se-

Nothing in the Code, however, gives weight to a banker's business judgment in determining whether a depositary bank took a check for value. When the check was in fact received, the overdraft in Bowl-Mor's account was only $5,024.85. Whether or not the Bank relied upon receiving a $15,306.00 check when it paid the $22,958.28 check cannot alter the fact that the only value given at the time the former check was deposited (insofar as Bowl-Mor's checking account was concerned) was $5,024.85.

7. The check was proceeds of Bowl-Mor's after-acquired chattel paper (UCC section 9–105(1) (b)) in which the Bank had a security interest.

curity interest in this check arose from an agreement executed before this check was drawn. There is no evidence that the Bank in any way sought to realize on its security interest by accepting deposit of this check.[8] The security interest held by the Bank, at the time it received the check for deposit,[9] did not fall within the types of security interests enumerated in UCC section 4–208 (1). There do not appear to be any cases on this question, and the parties have cited none. Decisions under the Code (*see, e. g.,* Waltham Citizens National Bank v. Flett, 353 Mass. 696, 234 N.E.2d 739 (1968); Citizens National Bank of Englewood v. Fort Lee Savings & Loan Ass'n, 89 N.J.Super. 43, 213 A.2d 315 (1965)), as under the prior law (*see, e. g.,* Universal C. I. T. Credit Corp. v. Guaranty Bank and Trust Co., 161 F.Supp. 790 (D.Mass.1958); National Deposit Bank of Owensboro v. Ohio Oil Co., 250 Ky. 288, 62 S.W.2d 1048 (1933)), involve situations where a depositary bank was or could have been held to have a security interest under UCC section 4–208.

▮▮▮ Holding that the Bank has given "value" for this check because of its pre-existing security interest is not significantly different from holding, as required by the Code, that "value" is given when a check is taken in payment of or as security for an antecedent claim (UCC section 3–303(b)) or that "value" is given when a depositary bank exercises a right of set-off (*see* note 9 *su-*

*pra*). In all three cases the holder parts with no present consideration but is deemed to give "value". The Bank had given "value" here when it received this check for deposit under UCC section 4–209.

## C. The Depositary Bank as a Holder "Without Notice".

Plaintiff's claim is that Bowl-Mor fraudulently induced it to negotiate (UCC section 3–202(1)) the Small Business Administration check to it, and that the Bank, when the check was deposited with it, had notice of the fraud. If Bowl-Mor committed fraud, and if the Bank had notice of the fraud, the Bank could not be a "holder in due course" under UCC section 3–302(1) (c) and thus would take the check subject to plaintiff's equitable interest in it.

Assuming there was fraud, the evidence before the court would preclude a finding that the Bank actually knew or received notice of it under subsections (a) and (b) of UCC section 1–201(25). The controversy centers on the question whether, at the time the check was deposited with the Bank on Tuesday morning September 27, 1966, the Bank had "reason to know" "from all the facts and circumstances known to * * * [it]" that there was fraud. UCC section 1–201 (25) (c).

▮▮▮ If it be assumed that when Bowl-Mor obtained negotiation of the check from plaintiff, it made an implied

8. Plaintiff concedes that if the Bank first applied the balance of the fund represented by the check to Bowl-Mor's outstanding loan debt, rather than first crediting Bowl-Mor's checking account, the Bank would have a security interest in the entire check under UCC section 4–208(1) (a).

9. After learning Bowl-Mor's Chapter X petition had been filed, the Bank debited the checking account $10,047.54 and credited the loan account with a like amount. The $10,047.54 was traceable to the Small Business Administration check deposited by Bowl-Mor. The Bank was exercising its common law right of set-off,

and probably acquired a security interest in the $10,047.54 at that time under UCC section 4–208(1) (a). *See* UCC section 4–208, Comment 1. But these events occurred about seven hours after the Bank received the check for deposit, and that seven-hour lapse is significant in determining whether the Bank took the check "without notice * * *" under UCC section 3–302(1) (c) at the time it set off $10,047.54. However, in view of the court's disposition of this action, and the reasons therefor, it is unnecessary to consider the Bank's status as a secured party when it made the set-off or at any time after it received the check.

representation that it would perform its wholly executory contract with plaintiff, and made this representation having no intention to perform the contract or made it recklessly disregarding its ability to perform the contract, under New Hampshire law (Doody v. John Sexton & Company, 411 F.2d 1119 (1st Cir. 1969)), such conduct would constitute actionable fraud.

What were the "facts and circumstances" known to the Bank at the start of business on Tuesday?

For a period of several years, commencing in 1957, the Bank was a substantial creditor of Bowl-Mor. At all times relevant to this litigation, the Bank vice-president, Haydock, was the Bank's loan officer in charge of the Bowl-Mor account. The Bank provided interim, short-term financing which assisted Bowl-Mor in performing contracts for delivery and installation of its pin-setting machines and related equipment. The Bank primarily relied on the security of unperformed contracts and Bowl-Mor's inventory, and, at least since March 1965, it shared with other creditors the security interest described above.

In July 1964 Haydock became a director of Bowl-Mor. At that time Bowl-Mor was experiencing considerable financial difficulty, and the Bank felt that it would be in its best interest to be able to watch the Company more closely by having Haydock on the board of directors. Bowl-Mor was experiencing difficulty in meeting its current trade obligations throughout 1966. Various suits were brought against it by creditors during the first nine months of 1966 and attachments were made at the Bank. The Company was operating at a substantial loss in 1966 and had been for some time prior thereto. Haydock was aware of this condition and knew, or had reason to know, that Bowl-Mor was insolvent in 1966

within the meaning of UCC section 1–201 (23).[10]

Throughout 1966, Bowl-Mor was indebted to the Bank in an amount in excess of three million dollars. On December 12, 1965 the Bank charged $500,000.00 of Bowl-Mor's debt to the Bank's reserve for bad debts. On May 23, 1966 the Bank again charged $500,000.00 to its reserve for bad debts. On August 9, 1966 another $500,000.00 of the indebtedness was charged to the bad debt account, and on September 29, 1966 an additional $500,000.00 of the debt was charged to the reserve for bad debts.

Haydock resigned from Bowl-Mor's board of directors on August 15, 1966. Two other directors representing Otis Elevator Company and General Electric Credit Corporation, substantial creditors of Bowl-Mor, had resigned about this time.

From August 15 until the filing of the Chapter X petition on Tuesday, September 27, the Bank's liability ledger shows that six loans were made to Bowl-Mor in the aggregate amount of $157,233.28. The last loan was made on September 12. During the same period, Bowl-Mor made three repayments in the aggregate amount of $92,844.24. The last repayment was made on September 20.

On September 23 (Friday) the directors of Bowl-Mor authorized its treasurer to file a Chapter X petition. The check from plaintiff was received by Bowl-Mor and deposited in the Bank after that vote was taken, but before the petition was filed on September 27. Haydock was not informed of the September 23 vote. He first learned of the petition at or around the time it was filed on September 27 at 3:30 p. m. Thus the Bank did not know of the Chapter X petition at the time it received the check for deposit and entered a $5,024.85 credit in Bowl-Mor's checking account, but did know of the

10. UCC section 1–201(23) provides as follows:

A person is 'insolvent" who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or is insolvent

within the meaning of the federal bankruptcy law.

Bowl-Mor is a "person" within the meaning of UCC section 1–201(23). UCC section 1–201(30), (28).

filing of the petition at the time it debited Bowl-Mor's checking account and credited Bowl-Mor's loan account in the amount of $10,047.54. Six days later, when the Bank for the second time credited Bowl-Mor's loan account with $10,047.54, the Bank was fully aware of the action taken by this court dismissing the Chapter X petition. When the Chapter X petition was filed, Bowl-Mor had no plan for the payment of creditors. There was no known source of funds to finance the Chapter X proceedings, but there is nothing to show that the Bank had any knowledge of these facts when it received the check.

 These facts show a course of dealing between the Bank and Bowl-Mor through September 27 during which the Bank knew or had reason to know that Bowl-Mor was insolvent. *Cf.* Texico State Bank v. Hullinger, 75 Ill.App.2d 212, 220 N.E.2d 248 (1966). In view of Bowl-Mor's continued operation and the Bank's continuing loans, however, the Bank's knowledge of Bowl-Mor's insolvency is not enough to show the Bank had reason to know of Bowl-Mor's assumed fraud.

The issue is whether the evidence, including the fact that the Bank knew or should have known of Bowl-Mor's insolvency on September 27, requires a finding [11] that the Bank then had no knowledge of "facts and circumstances" (UCC section 1–201(25) (c)) as would give it "reason to know" (*id.*) that Bowl-Mor accepted the check from plaintiff having no intention to perform the pin-setting contract or with reckless disregard of its ability to perform. The Bank knew the contract with plaintiff was wholly executory, as the Stipulated Facts (2 and 12) taken together with the Bank's knowledge of Bowl-Mor's business demon-

strate, but that alone would not conclude the issue of notice. *See* UCC section 3–304(4) (b).[12] During the time the Bank knew or should have known that Bowl-Mor was insolvent, and when it was experiencing difficulty in meeting its current trade obligations in 1966, Bowl-Mor obtained loans and made repayments on them. Fifteen days prior to September 27, it obtained a short-term loan from the Bank, and made a payment of $23,036.64 on account of its loans on September 20. There is nothing to show the loan made on September 12 was unusual in any significant respect, or that the payment on September 20 was unusual. There is nothing to show that the Bank, with Haydock no longer a director, had any information from which it knew or should have known of the vote of September 23, or that the Chapter X petition had been prepared for filing, or that Bowl-Mor's treasurer had the petition; and nothing is shown to put the Bank on notice that Bowl-Mor determined it could no longer operate without the protection of the Bankruptcy Court. A view of all the evidence satisfies the court that the Bank neither knew nor should have known of Bowl-Mor's inability to perform its contract with plaintiff when Bowl-Mor took the Small Business loan check from the plaintiff. In the absence of being charged with such knowledge, the Bank could not have known of any intention of Bowl-Mor not to perform its contract, or of the taking of the check from plaintiff by Bowl-Mor in reckless disregard of its ability to perform the contract. Until the Bank learned of the filing of the Chapter X petition, it had no notice of any "facts or circumstances" (UCC section 1–201(25) (c)) which would give it "reason to know" of the probability of wrongful conduct of Bowl-Mor in taking the check from plaintiff.

---

11. *See*, note 4 *supra.*

12. UCC section 3–304(4) (b) provides as follows:
 Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim * * * that it

[the instrument] was issued or negotiated in return for an executory promise or accompanied by a separate agreement, unless the purchaser has notice that a defense or claim has arisen from the terms thereof.

Thus, the Bank took the check from Bowl-Mor "without notice * * * of any * * * claim to it on the part of any person". UCC section 3–302(1) (c).

### Conclusion

 The Bank was a holder in due course of the Small Business Administration check, and took the check free from plaintiff's equitable claim to it. UCC section 3–305(1). Accordingly, judgment shall enter for the defendant dismissing the action.