PEORIA SAVINGS AND LOAN ASSOCIATION, Plaintiff-Appellee, *v.*
JEFFERSON TRUST AND SAVINGS BANK OF PEORIA,
Defendant-Appellant.

Third District   No. 79-52

Opinion filed October 5, 1979.

Stephen D. Gay and Donan C. Kirley, both of Davis & Morgan, of Peoria, for appellant.

John P. Ewart and Gregory C. Ray, both of Craig & Craig, of Mattoon, for appellee.

Mr. JUSTICE BARRY delivered the opinion of the court:

This is an appeal by defendant Jefferson Trust and Savings Bank of Peoria from a judgment entered in the Circuit Court of Peoria County for the plaintiff, Peoria Savings and Loan Association. The sole issue raised by Jefferson Trust on appeal is whether it was a holder in due course of a $70,000 check drawn on Peoria Savings which is the center of this controversy.

On January 30, 1975, Owen D. Cassidy, a Peoria businessman, maintained two accounts with Jefferson Trust. The first account, account No. 329-923, was a personal savings account in the name of "Owen D. Cassidy." The second account, account No. 036-765, was a checking account in the name of "Cassidy Company." On January 30, Cassidy deposited a $70,000 check in the personal savings account. The check, designating Cassidy as payee, was drawn on a Cassidy Company account at the Harris Trust and Savings Bank in Chicago. Provisional credit was given and as a result of withdrawals against his personal savings account only $8,960.78 of the credit originally given remained on February 5, 1975.

On the morning of February 5, a return teller at Jefferson Trust received a telephone call from the Continental Illinois Bank and Trust Company of Chicago, which was Jefferson Trust's intermediary bank in that city. The teller was informed that the $70,000 check drawn on the Harris Bank had been dishonored due to insufficient funds, and that this check was being returned to Jefferson Trust. The Jefferson Trust account at the Continental Bank was accordingly charged $70,000.

After receiving the telephone call from the Continental Bank, the teller contacted Ned Middendorf, vice-president of Jefferson Trust, and informed him of the dishonor. At 3 p.m., Middendorf made a telephone call to Cassidy, and after informing him of the dishonor, advised him that the $70,000 overdraft would have to be covered that day. Cassidy's response was that he "would take care of it."

About one-half hour after receiving Middendorf's telephone call, Cassidy went to Peoria Savings, which is located in a building adjacent to the building housing Jefferson Trust. When he got there he spoke to Barbara Horn, who at that time was a savings manager. He told Mrs. Horn that he desired to open a $10,000 savings account with Peoria Savings. After a short meeting with Peoria Savings' president, he returned to Mrs. Horn's desk and gave her an $80,000 check payable to Cassidy and drawn on the Cassidy Company account at the Northern Trust Bank in Chicago. Mrs. Horn used $10,000 of the Northern Trust check to open a savings account and gave Cassidy a check for $70,000 to cover the difference. This $70,000 check was payable to Cassidy and drawn upon a checking account Peoria Savings maintained at Jefferson Trust. The check was given to Cassidy at approximately 4 p.m. on February 5.

Ned Middendorf testified that at 4 p.m. he returned to his desk at Jefferson Trust after a short absence. At this time he discovered that on his desk had been placed a $70,000 check drawn on Peoria Savings' account at Jefferson Trust and payable to Cassidy, and a deposit ticket for Cassidy's personal Jefferson Savings account. This was the same account in which the dishonored $70,000 Harris Trust check had been deposited.

Middendorf delivered the $70,000 check and deposit ticket to a teller, but before the teller could even begin to process the check, Middendorf retrieved both documents. Middendorf then called Mr. Jim Berry, who was a vice-president at Peoria Savings, and inquired of Berry if he knew of any transactions involving Cassidy and large checks. Middendorf testified that the large amount of the check aroused his curiosity about Cassidy's ability to obtain large amounts of money. Berry stated that he knew nothing about the matter, but would inquire and call him back.

After Berry talked to Middendorf on the telephone, he talked to Mrs. Horn and learned of the transaction involving Peoria Savings and Cassidy. He then told her to call the Northern Trust Bank in Chicago to verify the amount of money Cassidy had in the Cassidy Company account. In response to her inquiry, Mrs. Horn was told by an employee of Northern Trust named "Mary" that the Cassidy Company account contained sufficient funds to cover the $80,000 check. After receiving this information, Berry and Horn discussed the matter with Peoria Savings' president, McFarland, who suggested Mrs. Horn call Northern Trust again and request they place a hold on the funds necessary to pay the $80,000 check. When Mrs. Horn called Northern Trust the second time, she again talked to Mary. Mary informed her that the first time she called she misunderstood her, and thought Mrs. Horn said an $8,000 check rather than an $80,000 check. Mary then told Mrs. Horn that there were insufficient funds in the account to cover an $80,000 check. In fact, the balance in the Cassidy Company account at Northern Trust was $8,700.80.

Mrs. Horn related this information to Berry, who then walked over to the Jefferson Trust and talked to Middendorf. The time was approximately 4:30 or 4:40 p.m. Berry told Middendorf that Northern Trust had advised his bank that there were insufficient funds to cover the $80,000 check delivered to Peoria Savings, and this check had been consideration for the $70,000 check now in Middendorf's possession. Although there is some dispute whether Berry gave Middendorf a verbal stop-payment order at this time, Middendorf testified that he told Berry a written stop-payment order would be prepared and ready for his signature the next morning. After this conversation, Berry left the bank.

The next morning, February 6, Berry arrived at Middendorf's office and signed the stop-payment order Middendorf had prepared. Middendorf's testimony was that at this time the $70,000 check and deposit

ticket were still in his possession and had not been processed in any way by Jefferson Trust. Later that day, Middendorf gave the check and deposit ticket to another Jefferson Trust vice-president, George Kirkpatrick. At approximately 4 p.m. the next day, February 7, Kirkpatrick took the check and deposit ticket to the proof department of Jefferson Trust, and the check was processed. As a result, Cassidy's personal account was then credited with $70,000. The stop-payment order was not presented by Kirkpatrick when the check was processed, as it was not in his possession at the time.

Kirkpatrick testified that although normally as a result of the stop-payment order Cassidy's account would have been debited $70,000 and the check on which the order had been placed returned to Cassidy, neither of these things was done, apparently because Jefferson Trust regarded Peoria Savings' stop-payment order as wrongful. Consequently, on February 10, the Peoria Savings account was debited $70,000. Berry was informed of this fact the next day. As a result of various transactions involving Cassidy's two Jefferson Trust accounts, the business account was closed. On March 19, $13,133.08, the balance remaining in Cassidy's personal account, was credited to the Peoria Savings account.

On February 4, 1976, Peoria Savings brought an action against Jefferson Trust to recover $56,866.92, the difference between the $70,000 check and the $13,133.08 credit Jefferson Trust gave Peoria Savings on March 19, 1975. A second count, eventually dismissed, also sought recovery based on Jefferson Trust's alleged failure to honor Peoria Savings' stop-payment order. On November 3, 1978, the court, sitting without a jury, entered judgment in favor of plaintiff for $56,866.92.

Defendant Jefferson Trust urges this court to reverse on the grounds that when Cassidy's $70,000 check appeared on the desk of Ned Middendorf at 4 p.m. on February 5, Jefferson Trust became a holder in due course, and as a consequence took the check free from all defenses except those real defenses enumerated in section 3—305(2) of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 3—305(2)). Under section 3—302(1) of the Uniform Commercial Code, a holder in due course is a holder who takes an instrument for value, in good faith, and without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. (Ill. Rev. Stat. 1975, ch. 26, par. 3—302(1).) The key question is whether Jefferson Trust took the $70,000 Peoria Savings check "for value" when it appeared on Middendorf's desk at 4 p.m. on February 5. If Jefferson Trust took "for value" at that precise moment it is a holder in due course because it took the check in good faith and without notice of any defenses available against it.

Under section 3—303(b) of the Uniform Commercial Code (Ill. Rev.

Stat. 1975, ch. 26, par. 3—303(b)), a holder takes an instrument for value when he takes that instrument in payment of, or as security for, an antecedent claim against any person whether or not the claim is due. Jefferson's contention is that when the $70,000 overdraft was created in Cassidy's personal account as a result of the dishonor of the Harris Trust check on February 5, and the indorser Cassidy was given his notice of dishonor, a cause of action or claim arose against Cassidy (Ill. Rev. Stat. 1975, ch. 26, par. 3—122(3)). The $70,000 Peoria Savings check, when it was received, was as a consequence taken by Jefferson Trust "in payment of * * * an antecedent claim" pursuant to section 3—303(b). Alternatively, Jefferson takes the position that under section 4—212(1) of the Code (Ill. Rev. Stat. 1975, par. 4—212(1)), Jefferson Trust has the right to a refund from Cassidy of the funds he had withdrawn from his personal account, which also constitutes an antecedent claim under section 3—303(b).

■■■ We agree with Jefferson Trust that the nearly $70,000 overdraft in Cassidy's personal account, which occurred as a result of the dishonor of the Harris Trust check, constituted an antecedent claim under the Code. However, we do not believe that the mere possession of the Peoria Savings check by Jefferson Trust, without more, was tantamount to a taking for value under section 3—303(b). Although there are no Illinois cases directly on point, cases from other jurisdictions indicate that before a bank takes a check payable to a depositor with an overdrawn account for value, the bank must, at the very least, apply the deposit to the overdraft or antecedent debt on a provisional basis. (See, *e.g., Bowling Green, Inc. v. State Street Bank & Trust Co.* (D. Mass. 1969), 307 F. Supp. 648; *Laurel Bank & Trust Co. v. City National Bank* (1976), 33 Conn. Supp. 641, 365 A.2d 1222; *United States Cold Storage Corp. v. First National Bank* (Tex. Civ. App. 1961), 350 S.W.2d 856; *Bath National Bank v. Ely N. Sonnenstrahl, Inc.* (1928), 249 N.Y. 391, 164 N.E. 327 (*dicta*); Annot., 59 A.L.R.2d 1173 (1958). *Cf. Marine Midland Bank—New York v. Graybar Electric Co.* (1977), 41 N.Y.2d 703, 395 N.Y. Supp. 2d 403, 363 N.E.2d 1139 (bookkeeping entry of provisional credit to overdrawn account not a parting with value); *Rockland Trust Co. v. South Shore National Bank* (1974), 366 Mass. 74, 314 N.E.2d 438.) "It has been generally been held or stated that the bank's application of the proceeds of a *deposited item* to the depositor's antecedent debt owed to the bank is a giving of value for the instrument and constitutes the bank a holder in due course." (Emphasis added.) (Annot., 59 A.L.R.2d 1173, 1194 (1958).) In the instant case, the Peoria Savings check was not deposited in Cassidy's account until the afternoon of February 7 when Kirkpatrick took the check to Jefferson Trust's proof department and had it processed. Consequently, the earliest Jefferson Trust "applied the

proceeds" and could have taken for value was 4 p.m. on February 7. The mere receipt of the check and deposit ticket by Middendorf—an event which cannot be classified as a deposit—most certainly did not constitute an application of the proceeds of the check to Cassidy's overdrawn account, and therefore was not the equivalent of a taking for value under the Uniform Commercial Code as that term has been interpreted.

■■ Because Jefferson Trust did not take for value at 4 p.m. on February 5, it is precluded from attaining the status of a holder in due course. At approximately 4:30 on the afternoon of February 5, Jefferson Trust had notice of a defense available to the Peoria Savings check because Middendorf had been informed by Peoria Savings' vice-president Berry at that time that the $70,000 check had been drawn in consideration of a virtually worthless check (the $80,000 check drawn on Continental). Middendorf's knowledge of Peoria Savings' expressed defense of failure of consideration constituted notice of a defense which, obtained prior to a giving of value, bars Jefferson Trust from being a holder in due course under section 3—302.

For the above reasons, we affirm the judgment of the Circuit Court of Peoria County.

Judgment affirmed.

STOUDER, P. J., and STENGEL, J., concur.