(No. 52747.—

PEORIA SAVINGS AND LOAN ASSOCIATION, Appellee, v. JEFFERSON TRUST AND SAVINGS BANK OF PEORIA, Appellant.

*Opinion filed September 15, 1980.*

Davis & Morgan, of Peoria (Stephen D. Gay and Donan C. Kirley, of counsel), for appellant.

John P. Ewart and Gregory C. Ray, of Craig & Craig, of Mattoon, for appellee.

MR. JUSTICE RYAN delivered the opinion of the court:

The defendant, Jefferson Trust and Savings Bank of Peoria (Jefferson), appeals a judgment entered in the circuit court of Peoria County for the plaintiff, Peoria Savings and Loan Association (Peoria Savings). The appellate court affirmed the judgment and we granted leave to appeal. Broadly stated, the issue is whether Jefferson became a holder in due course of a $70,000 check drawn by Peoria Savings under section 3—303(b) of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 3—303(b)) (taking an instrument in payment of an antecedent claim).

On January 30, 1975, Owen D. Cassidy, a Peoria businessman, maintained two accounts with Jefferson. One was a personal account in the name of "Owen D.

Cassidy"; the other was an account in the name of "Cassidy Company."

On January 30, 1975, Cassidy deposited a check for $70,000 in his personal account with Jefferson and was given provisional credit for that amount. The check, designating Cassidy as payee, was drawn on a Cassidy Company account at the Harris Trust and Savings Bank in Chicago (the Harris check). Between January 30, 1975, and February 5, 1975, $61,039.30 was withdrawn against the provisional credit given to the Cassidy account for the Harris check, leaving in his account at Jefferson on February 5, 1975, only $8,960.78.

On the morning of February 5, 1975, a Jefferson return teller received a telephone call from the Continental Illinois Bank and Trust Company of Chicago, which was Jefferson's intermediary bank in that city, advising that the Harris check for $70,000 had been dishonored for insufficient funds and was being returned. The Jefferson account at the Continental Bank was charged $70,000 for the dishonor. The teller informed Ned Middendorf, a vice-president of Jefferson, of the dishonor. At approximately 3 p.m. Middendorf informed Cassidy by telephone of the dishonor and advised him that the overdraft would have to be covered that day. Cassidy replied that he would take care of it.

Approximately one-half hour after receiving the demand from Jefferson, Cassidy arrived at Peoria Savings. He informed Barbara Horn, the savings manager, that he desired to open a $10,000 savings account with Peoria Savings. She took Cassidy to meet with the president of Peoria Savings to discuss interest rates. Within a few minutes Cassidy returned to Mrs. Horn and gave her an $80,000 check payable to Cassidy drawn on a Cassidy Company account at the Northern Trust Company of Chicago (the Northern Trust check). Without verifying the check, Mrs. Horn used $10,000 of the check to open

a savings account in Cassidy's name, and gave him a check for $70,000 to cover the difference (the Peoria Savings check). This check was payable to Cassidy and was drawn upon a checking account Peoria Savings maintained at Jefferson. This check was given to Cassidy at approximately 4 p.m.

The buildings housing Peoria Savings and Jefferson were adjacent to each other. At the trial, Middendorf testified he returned to his desk at approximately 4 p.m. after a short absence and discovered the Peoria Saving's check, which had been endorsed by Cassidy, laying on his desk. It was accompanied by a deposit ticket for Cassidy's personal account, the same account in which the dishonored $70,000 Harris check had been deposited.

Middendorf delivered the $70,000 check and deposit ticket to a teller, but before the teller processed the check, he retrieved both documents. Next, Middendorf called Jim Berry, a vice-president at Peoria Savings, and inquired as to the circumstances of the $70,000 Peoria Savings check and if Berry was familiar with transactions involving Cassidy and large checks. Middendorf testified that during prior business relationships Cassidy had mentioned transferring substantial deposits from Chicago banks to Jefferson and that the Peoria Savings check caused him to wonder if the large funds promised to Jefferson had been deposited with Peoria Savings. Berry stated that he knew nothing about the matter, but would inquire and call Middendorf back. After his conversation with Middendorf, Berry talked to Mrs. Horn and learned of the transaction involving Peoria Savings and Cassidy. He then requested that she call the Northern Trust to verify the Cassidy Company account. Mrs. Horn telephoned Northern Trust and was advised that the Cassidy Company account contained sufficient funds to cover an $80,000 check. Horn relayed this information to Berry, and they discussed the matter with Peoria Savings' president, Mr. McFarland. He

directed Mrs. Horn to call Northern Trust and request that they place a hold on the funds necessary to pay the $80,000 check. When Mrs. Horn made her request to the Northern Trust she was informed that there were sufficient funds to cover an $8,000 check but not an $80,000 check and that the Northern Trust employee had misunderstood her on the first call. At trial it was established that the balance in the Cassidy Company account at Northern Trust was $8,700.80 on February 5, 1975.

Mrs. Horn related this information to Berry and McFarland. At approximately 4:30 or 4:40 p.m., Berry walked over to the Jefferson and informed Middendorf that Peoria Savings had been advised by Northern Trust that there were insufficient funds to cover the $80,000 drawn on Northern Trust. Middendorf was advised that the $80,000 Northern check was the consideration for Peoria Savings issuing its $70,000 check to Cassidy. There is a dispute as to whether Berry placed a verbal stop order on the Peoria Savings check at this time; however, Middendorf testified he told Berry a written stop order would be prepared and ready for Berry's signature the next morning. After Berry left Jefferson, Middendorf placed the $70,000 Peoria Savings check and the accompanying deposit ticket in the bank vault.

The next morning, February 6, Berry arrived at Middendorf's office about 10 a.m. and signed the stop order that Middendorf had prepared. Middendorf still had the Peoria Savings check and the deposit slip in his possession; they were unprocessed. Later that day he turned them over to George Kirkpatrick, a senior vice-president at Jefferson, who retained possession of the documents. At approximately 4 p.m. on February 7, Kirkpatrick took the Peoria Savings check and deposit slip to the Jefferson proof department, the documents were processed, and Cassidy's account was credited $70,000. Kirkpatrick testified that he did not present

the written stop-payment order to the proof department with the check and deposit ticket because Jefferson considered it to be a wrongful order. Consequently, on February 10, the Peoria Savings account at Jefferson was debited $70,000 and Kirkpatrick testified the debit was a setoff for what was considered to be a wrongful stop-payment order. Peoria Savings was notified of the debit on February 11.

Subsequently, as a result of various transactions involving Cassidy's personal and business accounts with Jefferson, the business account was closed, and on March 19, 1975, $13,133.08, the balance remaining in the personal account, was credited to the Peoria Savings account.

On February 4, 1976, Peoria Savings brought this action against Jefferson to recover the amount of $56,866.92, the difference between the $70,000 check and the $13,133.08 credit given to Peoria Savings by Jefferson. On November 3, 1978, after a bench trial, the trial court entered judgment for Peoria Savings for $56,866.92. Jefferson appealed, and the appellate court affirmed the judgment of the trial court. 76 Ill. App. 3d 915.

Jefferson argues that it became a holder in due course as soon as Cassidy placed the Peoria Savings check on Middendorf's desk at 4 p.m. on February 5, 1975, and that, as a result, Jefferson took the check free from all defenses except those real defenses enumerated in section 3—305(2) of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 3—305(2)). We agree.

This case is controlled by the Uniform Commercial Code, which has been adopted in Illinois. (Ill. Rev. Stat. 1975, ch. 26, par. 1—101 *et seq.*) Section 3—302(1) (Ill. Rev. Stat. 1975, ch. 26, par. 3—302(1)) provides that a holder in due course is a holder who takes the instrument (a) for value, and (b) in good faith, and (c) without notice that it is overdue or has been dishonored or of any defense

against or claim to it on the part of any person.

Under section 3—303(b) (Ill. Rev. Stat. 1975, ch. 26, par. 3—303(b)), a holder takes an instrument for value when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due. It is a basic rule of statutory construction that the words of a statute should be given their plain, ordinary and accepted meaning, unless to do so would defeat the legislative intent. (*Department of Public Work & Buildings v. Wishnevsky* (1972), 51 Ill. 2d 550, 552; *Droste v. Kerner* (1966), 34 Ill. 2d 495, 503.) The word "take" means " 'to get into one's possession or power; to acquire; to obtain; to procure.' " (*Kimbell Trust & Savings Bank v. Hartford Accident & Indemnity Co.* (1928), 333 Ill. 318, 320.) Based upon the plain meanings of the words, it is apparent that Jefferson took the Peoria Savings check at 4 p.m. on February 5, 1975, when it was placed on Middendorf's desk. However, the plaintiff would have us read into the applicable legislative language a requirement that a bookkeeping entry must be made before the holder of the instrument taken in payment of an antecedent claim, or debt, can be said to have taken for value. Under the plain language of section 3—303(b) the holder takes for value when he takes an instrument in payment of an antecedent claim, not when he makes a bookkeeping entry.

Under the facts of this case, Jefferson had a claim against Cassidy before the Peoria Savings check was ever passed. Cassidy was the endorser of the dishonored Harris check and, under the Code, Jefferson did not have to make a bookkeeping entry in Cassidy's account before the claim against him came into existence. (Ill. Rev. Stat. 1975, ch. 26, par. 3—122(3).) In pertinent part, section 3—122(3) provides:

> "(3) A cause of action against *** an indorser of any instrument accrues upon demand following dishonor of

the instrument. *Notice of dishonor is a demand.*"

Thus, a cause of action against Cassidy arose when Cassidy was notified of the dishonor and a demand was made on him to cover this dishonor. The oral notification (Ill. Rev. Stat. 1975, ch. 26, par. 3—508(3)) of dishonor by Middendorf to Cassidy on February 5, 1975, was effective to produce a cause of action running to Jefferson. (Ill. Rev. Stat. 1975, ch. 26, par. 3—414.) It is clearly manifested that Jefferson had a claim or cause of action against Cassidy after Middendorf called Cassidy and demanded that he make good the Harris check.

Peoria Savings argues that Jefferson could not have been a holder in due course at 4 p.m. on February 5, 1975, of the $70,000 Peoria Savings check because Jefferson did not know how much of an overdraft was created in the Cassidy account as a result of the dishonored Harris check. From the facts it is clear Cassidy owed Jefferson a debt upon receiving notice of the overdraft on February 5. The size of the claim has no bearing on the issue of whether Jefferson took the Peoria Savings check for value, but only on the "extent" that Jefferson took for value.

The evidence in this case clearly indicated that the Peoria Savings check, coupled with the deposit slip, left on Middendorf's desk was delivered and taken in payment of Cassidy's antecedent debt to Jefferson. A short review of the facts bears this out. Middendorf testified that he contacted Cassidy by telephone at approximately 3 p.m., informed him of the dishonor of the $70,000 Harris check, and advised him that the overdraft created by the dishonor would have to be covered that day. Cassidy replied that he would take care of it and one hour later delivered the $70,000 Peoria Savings check to Jefferson. Thus it is clear that Cassidy intended the $70,000 Peoria Savings check to cover the antecedent debt he owed to Jefferson.

It has been held that the use by the legislature of

certain language in some provisions of a statute, and wholly different language in other provisions, indicates that different results were intended. (*Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 100.) Had the legislature intended under section 3—303(b) that a holder could not take an instrument for value until the instrument was "posted" to or "applied" to an account, it would have expressly so provided as it did in sections 4—213(1)(c) and 4—213(4) (Ill. Rev. Stat. 1975, ch. 26, pars. 4—213(1)(c), 4—213(4)). Since the legislature did not so provide, a requirement of "posting" or "applying" it should not be read into section 3—303(b).

Peoria Savings and the appellate court relied heavily on out-of-State cases to read a bookkeeping requirement into section 3—303(b). We find that reliance on these cases was misplaced. In none of the decisions relied on by the appellate court was the issue raised by this case squarely presented. See, *e.g., Bowling Green, Inc. v. State Street Bank & Trust Co.* (D. Mass. 1969), 307 F. Supp. 648; *Laurel Bank & Trust Co. v. City National Bank* (1976), 33 Conn. Supp. 641, 365 A.2d 1222; *United States Cold Storage Corp. v. First National Bank* (Tex. Civ. App. 1961), 350 S.W.2d 856; *Bath National Bank v. Eli N. Sonnenstrahl, Inc.* (1928), 249 N.Y. 391, 164 N.E. 327.

Peoria Savings next contention is that Jefferson was not a holder in due course because it took the check with notice that Peoria Savings had a defense. We find no merit to this contention. As noted in the record, when Jefferson took the check from Cassidy at 4 p.m. on February 5, 1975, Peoria Savings did not know it had a defense to the check. It was not until Jefferson contacted Berry, asking about the check, that anyone finally learned that there was a defense. Section 1—201(25) (Ill. Rev. Stat. 1975, ch. 26, par. 1—201(25)) of the Code provides that a person has "notice" of a fact when: "(a) he has actual knowledge of it; or (b) he has received a notice or

notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that is exists."

It is true that Middendorf retrieved the Peoria Savings check from the teller and called Berry at Peoria Savings to inquire about Cassidy. Middendorf testified that he was concerned that Cassidy may have made substantial deposits in Peoria Savings which he felt had been promised to Jefferson by Cassidy. Middendorf's actions only show that his suspicions were aroused concerning Cassidy's dealings. These suspicions were not tantamount to a reason for Middendorf to know that Peoria Savings had a defense to its check. Facts and circumstances calculated to merely arouse or excite suspicion cannot be equated with knowledge, or a reason to know. *Kavanagh v. Bank of America* (1909), 239 Ill. 404, 408.

Jefferson also knew of the dishonor of the Harris check, but this again did not cause it to know, or have reason to know, that Peoria Savings had a defense to its check. The knowledge that one of Cassidy's checks had been dishonored would not, when considered with the other facts, give Middendorf knowledge, or a reason to know, that a defense existed to the Peoria Savings check. Cassidy's credit with Jefferson was good, he had two small notes with Jefferson that were in good standing, and he did not have a history of writing checks which had been dishonored. This was Jefferson's first experience of a dishonored check with Cassidy. Jefferson had seen financial statements showing that Cassidy had substantial income and knew he was from a prominent local family. Considering all of the pertinent evidence in the record, and the applicable authorities, it is clear that Jefferson did not take the Peoria Savings check with notice that Peoria Savings had a defense to the check.

Lastly, Peoria Savings argues that, under section 4—302 (Ill. Rev. Stat. 1975, ch. 26, par. 4—302), Jefferson

is liable to Peoria Savings for the full amount of the $70,000 check because Jefferson failed to act on the check within its midnight deadline. This is an unusual argument in connection with section 4—302, in that the maker of a check is claiming that the payor bank is liable to the maker for the full amount of the check it drew on the payor. Ordinarily, the claim is that the payor bank is liable to the payee (in this case Cassidy) by virtue of section 4—302, not to the party issuing the check to the payee. (See *Rock Island Auction Sales, Inc. v. Empire Packing Co.* (1965), 32 Ill. 2d 269, 272.) The argument is difficult to follow, and we need not address it. At the trial level it was argued that by virtue of the failure of Jefferson to observe the midnight return requirement of section 4—302, it became "absolutely liable to Owen Cassidy for the amount of the check," and not to Peoria Savings as now urged. The question of section 4—302 compliance was not argued as an independent issue in the trial court but was urged in connection with Jefferson's handling of the stop-payment order to demonstrate "bad faith" on the part of Jefferson. The controlling question litigated in the trial court was whether Jefferson was a holder in due course. That was the issue in the appellate court and the controlling issue here. We have above concluded that Jefferson was a holder in due course under the provisions of the Uniform Commercial Code.

For these reasons we reverse the judgments of the appellate court and the circuit court of Peoria County.

*Judgments reversed.*